IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

FEBRUARY 1998 SESSION

FILED

September 11, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 01C01-9703-CC-00087 |
| Appellee, | * | GILES COUNTY |
| VS. | * | Honorable Jim T. Hamilton, Judge |
| RICHARD DARRELL MILLER and JOHNNY WAYNE GARNER, | * | (Voluntary Manslaughter and Aggravated Arson) |
| Appellants. | * | |
| | * | |

For Appellant Miller:

Robert D. Massey
P.O. Box 409
Pulaski, TN  38478

For Appellant Garner:

Hershell D. Koger
135 N. First Street
P.O. Box 1148
Pulaski, TN  38478

For Appellee:

John Knox Walkup
Attorney General & Reporter

Ellen H. Pollack
Assistant Attorney General
425 Fifth Avenue North
Cordell Hull Building, 2nd Floor
Nashville, TN  37243-0493

Mike Bottoms
District Attorney General
252 N. Military Avenue
Lawrenceburg, TN  38464

OPINION FILED: _____

AFFIRMED

GARY R. WADE, JUDGE

## OPINION

The defendants, Richard Darrell Miller and Johnny Wayne Garner, indicted for first degree murder and aggravated arson, were jointly tried and convicted of voluntary manslaughter and aggravated arson. The trial court sentenced each defendant to five years for manslaughter and fifteen years for aggravated arson. The sentences are to be served consecutively.

In this appeal of right, both defendants present the following issues:

(I) whether the evidence is sufficient to support each of the convictions; and

(II) whether the trial court erred by refusing to instruct arson as a lesser grade offense of aggravated arson.

The defendant Miller presents two additional issues:

(III) whether the trial court erred by granting the state's motion to consolidate and by failing to give adequate instructions on co-defendant Garner's confession; and

(IV) whether erroneous jury instructions require reversal.

(V) Finally, each defendant claims that the trial court erred by ordering consecutive sentences.

We affirm the judgment of the trial court.

In the early morning hours of October 27, 1995, Pulaski Fire Chief Jimmy Thompson responded to a fire at number 37 Town and County Trailer Park. Other firemen were already at the scene when Chief Thompson arrived. The victim, "Bud" Wright, was discovered at the west end of the mobile home; pieces of a table and chrome dinette chairs were found near the body. Chief Thompson, a certified fire investigator, suspected arson because of the trauma to the victim and the unusual position of the furniture. Because he was unable to locate any accelerants,

2

he concluded that he "couldn't definitely say it was arson."

Several days later, Officer John Dickey of the Pulaski Police Department interviewed Garner and Miller about the incident. Miller told Officer Dickey that at lunchtime on October 26, 1995, he met Garner and the victim at the victim's trailer. He recalled that about 2:30 P.M., he left the residence with his brother, Kirk Miller, and they went to their mother's house. Miller stated that he returned to the victim's residence sometime later. Garner and "three [other] guys," who were driving an older model county police car, were present. Miller remembered that he and Garner then went to a liquor store and to a convenient mart with the three men before returning to the victim's residence. Miller claimed that when these men left, he cooked dinner for the victim and that he and Garner then drove away. When Officer Dickey asked about an injury to his hand, Miller explained that he hurt himself while working on a roof.

Garner, who had spent the night of October 25 with the victim, provided a different account. He recalled Miller arriving at the residence at lunchtime on the day of the fire and remembered traveling to a liquor store with a neighbor, Donnie Brown, and then to a convenient store with three men in the white vehicle. Garner also recalled traveling to a second liquor store. He contended that when he and Miller left the victim's residence around 6:00 P.M., the three other men, who he could not identify, were still there.

Dr. Charles Harlan, a forensic pathologist who had performed the autopsy, found three concurrent causes of death: "blunt trauma to the chest, inhalation of carbon monoxide, and acute ethanolism." There were fractures to the sternum and multiple rib fractures caused by repeated blows to the chest area.

3

There had been an overexposure to carbon monoxide, which is a component of natural gas; the victim, who had a carbon monoxide level of 20 percent, would have to have had a 40 percent level for that to be classified as a sole cause of death. According to Dr. Harlan, the blood alcohol level of the victim, which was .36 percent, could have caused the death without the other two contributing causes. He explained that at .30 percent one in one thousand persons might die and at .40 percent level, fifty percent die. Dr. Harlan also observed that there were fourth degree burns over ninety-eight percent of the body and heat fractures to the teeth. An examination of the trachea, however, showed there was no soot present, "which means that he was not alive at the time that the body was burned ...."

On October 27, 1995, the day after the fire, Officer Chris Barber received a call about a fight at the Town and County Trailer Park. When he arrived at the scene, he learned that defendant Garner had been involved. Garner was then arrested for public intoxication and transported to the police station. On the way to the station, Garner told the officer that he could not believe he was being arrested for "what happened last night." Garner informed Officer Barber that the victim had been killed the night before and that it was "no accident." When Officer Barber asked him what he meant, Garner responded, "He was killed." Officer Barber advised Garner to discuss that matter with an investigator. Garner stated that he did not want to because "you know what happens to people that tell on other people."

Ricky Coleman, who is incarcerated in the Department of Correction on a theft conviction and who also had other charges pending at the time of trial, testified that he was in jail with Garner shortly after the fire. He claimed that Garner informed him that he had been drinking with the victim on the day of the fire and had

4

admitted that when everyone else had left, he and the victim began "scuffling and fighting." Coleman recalled that Garner acknowledged stabbing the victim several times, turning on the gas in the kitchen, and then leaving.

Guy Miller, who lived near the trailer park and knew both defendants by "name and face," testified that he saw both men leave the trailer park about 10:30 P.M., some ten minutes before the fire. He remembered that they were "laughing and carrying on, and kept looking back toward [the victim's] trailer." He recalled that Garner was not wearing a shirt. Later, Guy Miller heard a loud pop and saw a "big glow in the sky." He stated that the victim's body was located in the storage area of the trailer, an area in which he was rarely seen.

Donnie Brown, next-door neighbor to the victim, testified that he drove Garner and Miller to the store on the morning of the fire and then returned them to the victim's residence. He recalled that sometime later, Garner asked whether he had left a knife in his car. When they searched the vehicle, a knife was found on the passenger side of the seat. He remembered Garner saying that the victim had "said something [offensive] to" him and that he did not "appreciate being talked to like that." Brown stated that Garner cursed the victim and threatened to "whup" him.

Nancy Walls, who lived in a nearby trailer, testified that she saw Garner at the victim's trailer a couple of days before the fire; he was banging on the door with a two-by-four. She recalled that at approximately 8:00 P.M. on the evening of the fire, she heard an argument at the victim's trailer during which Garner had cursed the victim.

Roger Dale Clark, who lived two trailers away from the victim, testified

5

that between five and six o'clock P.M., only hours before the fire, he and his nephew went to the liquor store with Miller and Garner. About forty-five minutes after their return, Clark and his brother, Tim, returned to their own trailer, which they shared with their mother; only Garner, Miller, and the victim were left. Clark remembered that his brother went back to the victim's residence sometime later and he was asleep by the time his brother returned. Clark acknowledged that he had prior convictions for aggravated theft, two counts of forgery, unauthorized use of a motor vehicle, and illegal possession of a controlled substance.

Tim Clark testified that he stayed with the victim while the others rode to the liquor store. He also remembered that when he left with his brother, the victim and the defendants were the only ones there. He recalled that at one point, when the victim left the main area to go to the bathroom, Miller followed after him. Clark recalled that he could hear noises that sounded like someone was being beaten and that when Miller returned to the room, he was wiping his hands. Clark stated that he did not see the victim after that incident. He provided the police with this information about a week after the fire. Tim Clark acknowledged prior convictions for passing worthless checks and theft.

Officer Mike McCallister, who also interviewed both defendants about the fire, testified that Miller, who admitted being at the victim's trailer on the evening of the fire, had been drinking with Linda Hughes, Garner, and the other individuals. He recalled the defendant Miller claiming that he cooked dinner for the victim before leaving the trailer with Garner between 6:00 and 6:30 P.M.; Miller claimed that the victim was alone, intoxicated, and lying on his bed, but not asleep. Officer McCallister stated that Miller claimed that he had injured his swollen left hand while doing roofing work. Officer McCallister recalled that Garner provided a similar

6

statement. He remembered Garner saying that everyone was drinking and that Ms. Hughes and the "three guys" left the trailer about five minutes before he and Miller did. The officer recalled Garner claiming that when the two men left, the victim was "fine and ... cutting up."

Angela Norwood, a defense witness, testified that thirty minutes before the fire, Garner and Miller arrived at her trailer in a four-door white car driven by Charles Moore. She stated that the men knocked on her door, but that she did not answer, and the men soon left.

Blanch Miller, the defendant Miller's mother, testified that Miller was at her house until about 11:00 A.M. that morning, at which time she drove him to the victim's trailer. She stated that the next time she saw her son was at 6:00 P.M., when he stopped briefly at her house before returning to the victim's trailer. She recalled that Miller and Garner returned to her house around 7:00 P.M. and that defendant Miller was still there at 8:30 P.M. when her sister, Frances Miller, called. Ms. Miller testified that Gwen Warren, a neighbor, called at 7:00 P.M. and again at 10:30. She expressed with certainty that neither the defendant Miller nor the defendant Garner had left her trailer after 7 P.M. on the evening of the fire.

Kirk Miller testified that he drove his brother, the defendant Miller, from the victim's trailer to their mother's house at about 5:00 P.M. Frances Miller, an aunt, testified that the defendant Miller answered the telephone when she called his mother at 8:30 P.M.

Gwen Warren also testified for the defense. She recalled hearing about a fire at the trailer park. When she called Ms. Miller at approximately 10:30

7

P.M. she heard the defendant talking in the background.

Linda Hughes, who lived a few trailers away from the victim when the fire occurred, testified that she was at the victim's trailer before the fire. She left and upon her return a few hours later, did not see either defendant present at the trailer. On her second visit, she smoked crack cocaine with Timothy Clark, Roger Clark, and Charles Moore; she remembered that all three of the men were there when she left. Ms. Hughes acknowledged giving a prior statement to police in which she made no reference to her second visit to the victim's residence. She explained that she decided to "change [her] story" when she quit using illegal drugs.

I

The defendant Miller challenges the sufficiency of the evidence for his aggravated arson conviction. The defendant Garner argues there is insufficient evidence for both of his convictions.

On appeal, the state is entitled to the strongest legitimate view of the trial testimony and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). The relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

A person commits the crime of arson when he "knowingly damages

any structure by means of a fire or explosion" without the owner's consent. Tenn. Code Ann. § 39-14-301(a)(1). Arson becomes aggravated where "one (1) or more persons are present therein." Tenn. Code Ann. § 39-14-302.

Viewed in the light most favorable to the state, the evidence establishes that Miller and Garner were the last people to see the victim alive. Tim Clark testified that before he left, Miller had severely beaten the victim. Miller, who had a swollen left hand the day after the fire, was seen leaving the area a few minutes before the trailer exploded; he was "laughing and carrying on, ... looking back toward" the victim's residence. The body was discovered in the storage room in the trailer, an area he rarely occupied. Furniture from the kitchen and living room had been piled on top of the victim. One of the contributing causes of death was an extraordinarily high level of carbon monoxide. These circumstantial facts are sufficient to support the verdict of guilty of aggravated arson. They support the state's theory that the defendants disabled the victim, placed him in the storage room, piled furniture on him, started the fire, and then left.

Miller argues that the state's own expert could not determine that the cause of the fire was arson. He cites Ricketts v. State, 241 S.W.2d 604, 605 (Tenn. 1951), where our supreme court held that "if nothing appears but the mere fact [of a fire,] the presumption is that the fire was a result of accident or some providential cause."

Proof of an arson requires two "fundamental facts": "a burning" and "some criminal agency which caused the burning." Collins v. State, 445 S.W.2d 931, 933 (Tenn. Crim. App. 1969). The state, however, is not necessarily required to use expert testimony in an arson case. In State v. Henley, 774 S.W.2d 908

9

(Tenn. 1989), the defendant was convicted of two counts of first degree murder and one count of aggravated arson. In that case, the fire marshall suspected arson but there was "no physical evidence of that fact." Id. at 914. The defendant argued that in the absence of "any proof of a criminal agency which caused the burning," he could not be convicted of arson. Id. at 913. Our supreme court nonetheless found the evidence sufficient. One victim at the scene of the fire had died from a gunshot wound; the other died of burns and gas inhalation. A witness had seen the defendant drive toward the scene of the fire minutes before the fire occurred. Henley was seen leaving the area soon after the fire started. In our view, the ruling in Henley governs in this case.

The defendant Miller also argues that because it was undisputed that the victim was dead at the time the fire began, an element of the crime of aggravated arson, that a "person" be present, was not proved. Tenn. Code Ann. § 39-14-302. Miller argues a corpse, rather than a "person" was present and that burning a corpse is a separate crime. See Tenn. Code Ann. § 39-17-312.

While Dr. Harlan did testify that the victim had already died when the fire began, the evidence shows that the defendants, who were the last to leave, disabled the victim before leaving the trailer. Minutes after their departure, the trailer erupted into flames. Gas, a contributing cause of death, also was a factor in the fire. Under these circumstances, there is sufficient evidence to support the conclusion that the defendants completed all of the acts necessary to cause the fire prior to leaving the trailer. In short, the victim qualified as a "person" when the arson was initiated. That he died while the defendants were in the act of starting the fire, rather than after the explosion, does not afford the defendant Miller relief from this conviction.

10

There is also ample evidence to support Garner's conviction for aggravated arson. In addition to the proof outlined above, Garner admitted to a cellmate that he turned on the gas in the trailer before his departure. These facts establish his liability for aggravated arson.

Garner also challenges the sufficiency of the evidence for his voluntary manslaughter conviction. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Here the proof establishes some type of ongoing feud between Garner and the victim. The proof also shows Garner was involved in an attack upon the victim before his departure and that he turned on the gas as he left, thereby establishing "knowing" acts. Trauma to the chest and overexposure to carbon monoxide were contributing causes of death. In our view, these facts are sufficient to support the jury's verdict of guilty of voluntary manslaughter.

Garner also argues that because the defendant Miller caused the trauma to the chest of the victim and because voluntary intoxication was also a contributing factor, he cannot be held criminally responsible for the death. We disagree. Garner's argument ignores proof that he admitted to a cellmate that he "stabbed" the victim several times. By turning the gas on in the trailer, Garner was the source of a third contributing factor, the carbon monoxide poisoning. To convict the defendant of homicide, it "is not necessary that his act ... be the sole cause, nor the most immediate cause of death." State v. Roberson, 644 S.W.2d 696, 699 (Tenn. Crim. App. 1982). All that is required is that the defendant unlawfully "contributed to the death of the deceased." Id. (citing Letner v. State, 299 S.W. 1049 (Tenn. 1927)). If an act of the accused contributes to the death, he may be

11

held responsible even though the acts of a third party may have also contributed to the death. 40 C.J.S. Homicide § 5 (1991).

II

The next issue is whether the trial court erred by refusing to charge arson as a lesser grade offense of aggravated arson. Both defendants argue that there is insufficient evidence of aggravated arson and that an arson instruction was required based upon the proof presented at trial.

The trial court has a duty to give a complete charge of the law applicable to the facts of the case. State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). It is settled law that "where there are any facts that are susceptible [to an inference] of guilt of any lesser included offense or offenses, then there is a mandatory duty upon the trial judge to charge on such offense or offenses. Failure to do so denies a defendant his constitutional right of trial by a jury." State v. Wright, 618 S.W.2d 310, 315 (Tenn. Crim. App. 1981) (citations omitted). When there is a trial on a single charge of a felony, there is also a trial on all lesser included offenses, "as the facts may be." Strader v. State, 362 S.W.2d 224, 227 (Tenn. 1962). Trial courts may omit an instruction on a lesser included offense only when the record is devoid of evidence to support an inference of guilt of the lesser offense. State v. Stephenson, 878 S.W.2d 530, 550 (Tenn. 1994); State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990). There is an affirmative duty on the part of the trial judge to charge the jury on lesser included offenses charged in the indictment whether requested to do so or not. See Howard v. State, 578 S.W.2d 83, 85 (Tenn. 1979).

In State v. Boyce, 920 S.W.2d 224 (Tenn. Crim. App. 1995), this court

12

ruled that an omission of a lesser included offense from the charge to the jury always requires a new trial.  The opinion was largely based upon the ruling of our supreme court in Poole v. State, 61 Tenn. 288, 294 (1872):

> However plain it may be to the mind of the Court that one certain offense has been committed and none other, he must not confine himself in his charge to that offense.  When he does so he invades the province of the jury, whose peculiar duty it is to ascertain the grade of the offense.  However clear it may be, the Court should never decide the facts, but must leave them unembarrassed to the jury.

On the other hand, "[w]here the evidence in a record clearly shows that the defendant was guilty of the greater offense and is devoid of any evidence permitting an inference of guilt of the lesser offense, the trial court's failure to charge on a lesser offense is not error."  Stephenson, 878 S.W.2d at 530.  This court has held that no instruction is required where the evidence shows that the crime was committed and the only issue is whether this particular defendant was the one who committed the crime.  Price v. State, 589 S.W.2d 929, 932 (Tenn. Crim. App. 1979).  "Where the State's evidence establishes that the crime specified in the indictment was committed and the defendant seeks only to establish an alibi, leaving the State's evidence as to the degree of crime uncontradicted, no instructions on lesser included offenses are required."  State v. Barker, 642 S.W.2d 735, 738 (Tenn. Crim. App. 1982).

In State v. Trusty, our supreme court observed that "Tennessee law recognizes two types of lesser offenses ... : a lesser grade or class of the charged offense and a lesser included offense."  919 S.W.2d 305, 310 (Tenn. 1996).  The trial judge has a statutory duty to charge the jury "on lesser grades or classes of the charged offense supported by the evidence."  Id.; Tenn. Code Ann. § 40-18-110.  The trial judge also has a duty grounded in case law to instruct the jury on lesser

13

included offenses.  Trusty, 919 S.W.2d at 311.

A lesser grade or class of the charged offense is determined by reference to the statutory scheme.  Id.  For example, varying grades and classes of homicide are defined at Tenn. Code Ann. § 39-13-201 and codified at Tenn. Code Ann. §§ 39-13-202 et. seq.

The other type of lesser offense is one "necessarily included in the indictment."  Trusty, 919 S.W.2d at 311.  In Wright v. State, 549 S.W.2d 682 (Tenn. 1977), our supreme court outlined the test to determine whether an offense is lesser and included in the greater offense.  Quoting the late Justice Weldon White in Johnson v. State, 397 S.W.2d 170, 174 (Tenn. 1965), the court ruled as follows:

> The true test of which is a lesser and which is a greater
> crime is whether the elements of the former are
> completely contained within the latter, so that to prove
> the greater the State must first prove the elements of the
> lesser.

Wright, 549 S.W.2d at 685-86.

Two years later, our supreme court again addressed the subject:

> We believe that the better rule, and the one to be
> followed henceforth in this State, is the rule adopted
> implicitly by this court in Wright v. State, supra, that, in
> this context, an offense is necessarily included in another
> if the elements of the greater offense, as those elements
> are set forth in the indictment, include, but are not
> congruent with, all elements of the lesser.  If there is
> evidence to support a conviction for such a lesser
> offense, it must be charged by the trial judge. T.C.A. §
> 40-2519 [now Tenn. Code Ann. § 40-18-118(a)]; Whitwell
> v. State, 520 S.W.2d 338 (Tenn. 1975).

Howard, 578 S.W.2d at 85.

Arson is a lesser grade of aggravated arson.  It is also a lesser

included offense. We must conclude, however, that an arson was not an alternative in this case. The defendants were either guilty of the greater crime, based upon the proof offered at trial, or nothing at all. The defense to the charges was that of alibi. Several defense witnesses testified that Miller and Garner were at Ms. Blanch Miller's residence when the fire occurred. The purpose of Ms. Hughes' testimony was to suggest that someone other than the defendants was responsible for the fire. The victim was in the trailer when the series of acts, including the release of carbon monoxide gas, resulting in the fire were begun. In our view, the jury's only task was to determine the identity of the perpetrator, not the degree of the arson. Price, 589 S.W.2d at 932.

A possible argument is that because the victim died before the fire actually began, there was a reasonable basis for the jury to conclude that a simple arson occurred. The defendants insist that there is proof that there was not "a person" inside the structure when the fire occurred; therefore, the arson could not have been aggravated.

This court addressed a similar issue in State v. Alcorn, 741 S.W.2d 135 (Tenn. Crim. App. 1987). In that case, the defendants were convicted of possession of "[t]hirty grams or more of any substance containing cocaine." Id. at 138 (citing Tenn. Code Ann. § 39-6-417(c)(1)(E) (Supp. 1986)). Tests established that they possessed 26.39 grams of "pure cocaine" and that the remaining ingredient was a "cutting agent." Id. at 137. The defendants argued that because the amount of cocaine was less than thirty grams, they were entitled to an instruction on lesser offenses. Id. at 139. The trial court, however, found that as a matter of statutory interpretation, the amount they possessed satisfied the thirty-gram amount. Id. This court ruled the matter to be a "question of law, not of fact."

15

Thus, the defendants were not entitled to a jury charge on lesser offenses.  Id.

Here, no set of circumstances, whether offered by the state or the defense, established that the victim was a corpse at the time steps were initiated to commit the arson.  Because it is undisputed that carbon monoxide gas was present in the body, thereby contributing to both the fire and the death of the victim, the defendants cannot prevail on this issue, whether the question is one of law or fact.

### III

The defendant Miller argues that the trial court erred by not granting a severance and by failing to instruct the jury on co-defendant Garner's confession to cellmate Coleman.  The defendants were indicted separately; the state, however, filed a motion to consolidate.  The defendant Miller filed an objection to consolidation, arguing Garner's pretrial statements would inculpate Miller, but Miller would not be able to cross-examine Garner, thus causing a Bruton problem.  See Bruton v. United States, 391 U.S. 123 (1968).  The trial court granted the state's motion.

During the state's case-in-chief, Ricky Coleman testified that he was incarcerated with defendant Garner after the fire and that Garner discussed the events leading up to the victim's death.  When Miller renewed his objection, arguing that the state either had "to figure a way to keep Mr. Miller out of it or Mr. Miller is entitled to a separate trial," the state, out of the presence of the jury, instructed its witness to not say "anything in regard to Mr. Miller."

Coleman testified that Garner told him that he was at the trailer drinking when he and the victim got into a fight.  Garner informed Coleman that he

16

stabbed the victim several times and then turned the gas on in the kitchen before leaving. During cross-examination by Attorney Koger, the defendant Garner's attorney, the following exchange occurred:

> Attorney Koger: You said [in your prior statement] that apparently there was an ... extension cord tied around [the victim's] legs?
>
> Coleman: That wasn't done by Mr. Garner.
>
> Attorney Koger: Pardon?
>
> Coleman: That wasn't done by Mr. Garner.
>
> Attorney Koger: But here again, if we had testimony in here that when the body was found, there was nothing wrapped around the legs or anything unusual about that, that wouldn't be consistent, either, would it?
>
> Coleman: Well, I don't know.
>
> Attorney Koger: Well, it wouldn't be the same thing that you are saying that he told you?
>
> Coleman: Well, I'm just--that's what I said. What he told me.
>
> Attorney Koger: Sure. That makes it inconsistent. Right?
>
> Coleman: If you say so.

No limiting instructions were given to the jury. Defendant Miller argues that the above exchange, wherein Colemen testified that Garner did not restrain the victim with an extension cord, implicated Miller. He also argues that the only proof of an arson is Garner's statement that he turned on the gas in the kitchen and then left.

Rules 8, 13, and 14, Tenn. R. Crim. P., govern when codefendants may be tried together. Rule 8(c) states that "two or more defendants may be joined in the same indictment, presentment, or information: (1) if each of the defendants is charged with accountability for each offense included; or (2) if each of the defendants is charged with conspiracy, and some of the defendants are also

17

charged with one or more offenses alleged to be in furtherance of the conspiracy." Rule 13(a) of the Tennessee Rules of Criminal Procedure provides that the court "may order consolidation of two or more indictments, presentments, or information for trial if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8."

Offenses which are permissively joined under Rules 8 and 13 may be severed upon motion of the defendant as a matter of right under Rule 14:

(c) Severance of Defendants.

(1) If a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant, the court shall determine whether the state intends to offer the statement in evidence at trial. If so, the court shall require the prosecuting attorney to elect one of the following courses:

(i) A joint trial at which the statement is not admitted into evidence or at which, if admitted, the statement would not constitute error; or
(ii) A joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been deleted, if, as deleted, the confession will not prejudice the moving defendant; or
(iii) Severance of the moving defendant.

Absent a showing of prejudice, a reviewing court may not overturn the trial court's exercise of discretion on the issue of severance. State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981); State v. Hopper, 695 S.W.2d 530 (Tenn. Crim. App. 1985).

The statement of a non-testifying co-defendant implicating another defendant violates the constitutional rights of the latter in a joint trial. Bruton v. United States, 391 U.S. 123 (1968). The ruling in Bruton is based on the acknowledgment that "admission of a co-defendant's confession implicating a

18

defendant at a joint trial constitutes prejudicial error even though the trial court may give clear, concise and understandable instructions that confessions could only be used against a co-defendant and must be disregarded with respect to any other defendant." State v. Bailey, 865 S.W.2d 7, 9 (Tenn. 1993).

After Bruton, a plurality of the United States Supreme Court had held that where both defendants have given interlocking confessions and the trial judge gives an appropriate limiting instruction, the defendant's constitutional rights are not violated. Parker v. Randolph, 442 U.S. 62 (1979). In Cruz v. New York, 481 U.S. 186 (1987), however, the United States Supreme Court held that even if the defendant's own confession is admitted and the jury is correctly instructed as to how to analyze the nontestifying co-defendant's confession, the Confrontation Clause is violated if the nontestifying co-defendant's confession implicates the defendant. Under Cruz, a Bruton error may be avoided by "proper redaction of the confession." State v. Person, 781 S.W.2d 868, 872 (Tenn. Crim. App. 1989).

It is only when all connecting references to the defendant are redacted from the co-defendant's statement that the evidence may be admitted. See Dorsey v. State, 568 S.W.2d 639, 642 (Tenn. Crim. App. 1978); Taylor v. State, 493 S.W.2d 477, 480 (Tenn. Crim. App. 1972). Any violation of the defendant's rights under the Confrontation Clause may be subjected to a harmless error analysis. Cruz, 481 U.S. at 194; State v. Porterfield, 746 S.W.2d 441, 446 (Tenn. 1988).

In our view, the state took appropriate measures to protect defendant Miller's right to confront adverse witnesses. Coleman was instructed not to make any reference to defendant Miller's participation; he complied with that directive. The above-quoted exchange, wherein Coleman testified that Garner did not bind the

19

victim's legs with an extension cord, did not implicate Miller only because further cross-examination clearly established that there was no proof that anyone had bound the victim's legs. The point of the cross-examination, in our interpretation, was that no one had bound the victim's legs, not that Miller had done so.

Even if the testimony did imply Miller had bound the victim's legs, an inference unsupported by any other facts in evidence, Tim Clark testified that just before he left, he overheard Miller severely beat the victim. In our view, any Bruton error which may have inadvertently occurred by the exchange was harmless beyond a reasonable doubt. Porterfied, 746 S.W.2d at 446.

The defendant Miller also argues that Garner's confession that he turned on the gas and then left is the only evidence of an arson. Thus, he argues that absent Garner's confession, he could not be found guilty of arson. We cannot agree. There is ample other evidence of Miller's participation in the aggravated arson. See Henley, 774 S.W.2d at 914. Miller was one of the last people seen with the victim at the trailer. A short time before the fire, he beat the victim and was then seen leaving the trailer. The victim's body, which had a high level of carbon monoxide gas, was found in the storage area, an area where the victim was rarely seen.

Miller also complains that the trial judge failed to give a limiting instruction when Coleman's testimony was admitted into evidence. In Richardson v. Marsh, 481 U.S. 200, 211 (1987), the Supreme Court addressed admission of a properly redacted confession accompanied by limiting instruction:

> The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical

20

> accommodation of the interests of the state and the
> defendant in the criminal justice process. On the precise
> facts of Bruton, involving a facially incriminating
> confession, we found that accommodation inadequate.
> ...[T]he calculus changes when confessions that do not
> name the defendant are at issue. ... We hold that the
> Confrontation Clause is not violated by the admission of
> a nontestifying codefendant's confession with a proper
> limiting instruction when, as here, the confession is
> redacted to eliminate not only the defendant's name, but
> any reference to her existence.

This court has interpreted Richardson as requiring a limiting instruction; the failure to give one, however, may be found to be harmless. Person, 781 S.W.2d at 872. The trial judge erred by failing to give a limiting instruction. We conclude, however, that that omission clearly had no impact on the verdict. See id.

IV

Miller also argues that the trial court erred by refusing to give a special jury instruction that "if nothing appears but the fact of burning, there is a presumption that fire was a result of accidental or providential cause." (citing Ricketts v. State, 241 S.W.2d 604 (Tenn. 1951)).

The trial court, of course, has a duty to give a complete charge of the law applicable to the facts of the case. Harbison, 704 S.W.2d at 319. While the defendant may request special instructions, jury instructions are sufficient where they adequately state the law. See, e.g., State v. Tyson, 603 S.W.2d 748 (Tenn. Crim. App. 1980). When a trial court's charge to the jury is complete, it need not give additional special instructions requested by the defendant. See State v. Story, 608 S.W.2d 599, 603 (Tenn. Crim. App. 1980).

The trial judge instructed on aggravated arson as follows:

21

Aggravated arson:  Any person who commits the offense of aggravated arson is guilty of a crime.

For you to find the defendants guilty of this offense, the State must have proven, beyond a reasonable doubt, the existence of the following essential elements:

One, that the defendants, by means of fire or explosion, damaged a structure as described in the indictment;

And two (a), that the defendants did so without the consent of all persons who have a possessory, proprietary, or security interest therein;

Or (b), that the defendants did so with intent to destroy or damage the structure for any unlawful purpose.

And three (a), that one or more persons were present therein;

Or (b), that a person suffered bodily injury as a result of the fire or explosions;

And four, that the defendants acted knowingly.

To constitute a burning within the meaning of this instruction, it is not necessary that the subject of the fire be destroyed.  There is sufficient burning if the nature of the combustible to which the fire or explosive is set is changed or charred.

***

Property means anything of value, including, but not limited to, money, real estate, or tangible or intangible personal property.

In our view, the trial court's instructions on aggravated arson were correct and complete statements of the law.  Thus, the trial court did not err by refusing to give the special instruction.

V

The final issue is whether the trial court erred by ordering each defendant to serve consecutive sentences.  Each defendant was sentenced to five years for manslaughter, which has a range of three to six years, and fifteen years for aggravated arson, which has a range of fifteen to twenty-five years.  The sentences were ordered to be served consecutively for effective terms of twenty years.  Both defendants argue that the trial court did not make the appropriate findings on the

22

record to support imposition of consecutive sentences.

Garner was twenty-seven years old when his presentence report was compiled. He has seven prior convictions for public intoxication, one aggravated assault conviction, two simple assault convictions, and one conviction for stalking. The aggravated assault conviction occurred in 1994 and the defendant received five years on probation. The report indicates that the defendant takes medication for depression and uses alcohol excessively. He has a sporadic work history as a laborer.

Miller has over fifteen prior convictions for public intoxication. He also has prior convictions for resisting arrest, driving on a revoked license, reckless driving, DUI, disobeying traffic laws, and failing to stop at the scene of an accident. He completed the ninth grade and obtained certification for tack welding and inner shield welding. He worked as a carpenter for his brother, Kirk Miller, from 1986 until 1995.

Barbara Watson, the victim's brother, testified that the trauma of losing her brother was exacerbated by the fact that foul play was involved. She and her family asked that both defendants receive the maximum sentences possible. The victim's mother, Geraldine Wright, testified that her son's death "tore [her family] to pieces."

When a challenge is made to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a "de novo review ... with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission

23

Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210.

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution: "[C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." Taylor, 739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the

24

following criteria[1] exist:

> (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The defendant is sentenced for an offense committed while on probation;
>
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

In <u>Gray</u>, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, as now defined by subsection (b)(4) in the statute, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to

---

[1] The first four criteria are found in <u>Gray</u>. A fifth category in <u>Gray</u>, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. <u>See</u> Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

the severity of the offenses.

In <u>State v. Wilkerson</u>, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The <u>Wilkerson</u> decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in <u>State v. Woods</u>, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." <u>Wilkerson</u>, 905 S.W.2d at 938. The record must show that the sentencing principles and all relevant facts and circumstances were considered before the presumption of correctness applies.

Because the trial judge failed to make any findings as to why he ordered the sentences to be served consecutively, our review is <u>de novo</u> without the presumption of correctness. As to Garner's sentence, we find two grounds for imposing consecutive sentences:

> (1) the defendant is an offender whose record of criminal activity is extensive; and
>
> (2) the defendant is sentenced for an offense committed while on probation.

<u>See</u> Tenn. Code Ann. § 40-35-115(b)(2), (6). We also find that the term is "reasonably related [] to the severity of the offenses committed." <u>Wilkerson</u>, 905 S.W.2d at 938. The twenty-year sentence is also necessary to protect society from "further criminal acts." Garner has exhibited an escalating pattern of violence, starting with simple assault convictions, then aggravated assault, and now

26

aggravated arson and manslaughter. Consecutive sentences for Garner are entirely appropriate.

In our de novo review of Miller's sentence, we find that he is "an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2). Although his prior criminal history does not show a pattern of committing violent crimes, his record is extensive. He has over fifteen prior convictions for public intoxication. He also has prior convictions for resisting arrest, driving on a revoked license, reckless driving, DUI, disobeying traffic laws, and failing to stop at the scene of an accident. The convictions date back to 1984. Most of the convictions appear to have been alcohol related. Absent a lengthy period of incarceration, further misconduct appears likely. In our view, the twenty-year sentence is reasonably related to the severity of the offenses. See Wilkerson, 905 S.W.2d at 938. We also approve of the imposition of consecutive sentences for Miller.

Accordingly, the judgment of the trial court is affirmed.

_____
Gary R. Wade, Judge

CONCUR:


_____
William M. Barker, Special Judge


_____
Curwood Witt, Judge