## WILL LETNER v. THE STATE.*

### (*Knoxville.* September Term, 1927.)

Opinion filed November 21, 1927.

1. **CRIMINAL LAW. EVIDENCE. PREPONDERANCE.**

From the facts detailed there is a preponderance of the evidence against the defendant. (Post, p. 72.)

2. **CRIMINAL LAW. MOTION TO QUASH INDICTMENT. MINUTE ENTRY. PRESUMPTION.**

Where there is no minute entry showing that the motion to quash the indictment was called to the attention of the court, nor action had thereon, it will be presumed that the motion to quash was waived. (Post, p. 72.)

3. **CRIMINAL LAW. MOTION TO QUASH. MOTION FOR A NEW TRIAL. APPEAL.**

In order to take advantage of the failure of the trial court to grant a motion to quash an indictment in the lower court such refusal must be made the basis of a motion for a new trial. (Post, p. 72.)

4. **CRIMINAL LAW. INVOLUNTARY MANSLAUGHTER. CHARGE OF THE COURT. ERROR.**

Where the charge of the court details a state of facts constituting involuntary manslaughter, then makes a correct statement of the law, the misstatement of fact so made must be taken advantage of at the time in order to put the trial court in error. (Post, p. 73.)

5. **CRIMINAL LAW. INVOLUNTARY MANSLAUGHTER. HOMICIDE.**

Where a person unintentionally or accidentally kills another while engaged in an unlawful act, he is guilty of some degree of homicide. (Post, p. 73.)

Citing: State v. Radford, 56 Kansas, 591, 44 Pac., 19; Adams v. People, 109 Ill., 444, 50 Am. Rep., 617; Norman v. U. S., 20 App. (D. C.), 494; 3 Russell on Crimes, (6 Ed.), page 12; Reg. v.

Pitts, Cor. & M., 284; Studstill v. State, 7 Georgia 2; Rex v. Sullivan, 7 Cor. & P., 641.

6. CRIMINAL LAW. HOMICIDE. DEFENSE. SUPERVENING CAUSE.

Where it appears that the act of the accused was not the proximate cause of the death of the person for whose murder he is being prosecuted, but that another cause intervened with which he was in no way connected, and but for which death would not have occurred, said supervening cause is a good defense to the charge of homicide, unless the act of intervention is the natural result of the defendant's act. (Post, p. 75.)

Citing: 13 R. C. L., 750, 753; 29 C. J., 1078.

7. CRIMINAL LAW. SUPERVENING CAUSE.

The defendant cannot escape the consequences of his wrongful act by relying upon a supervening cause, which such cause naturally results from his wrongful act. (Post, p. 76.)

Citing: Reddick v. Commonwealth, 17 Ky. L., 1020, 33 S. W., 416; Mayes v. People, 106 Ill., 306, 46 Am. Rep., 698; People v. Goodwin, 1 Wheel Cr. (N. Y.), 253; Hendrickson v. Com., 85 Ky., 281, 3 S. W., 166, 7 Am. St. Rep., 596; State v. Preslor, 48 N. C., 421; Belk v. People, 125 Ill., 584, 17 N. E., 744.

8. CRIMINAL LAW. HOMICIDE. INDEPENDENT INTERVENING CAUSE.

Where it appears that the death did not result from an act of the defendant but from some independent intervening cause, the defendant would not be guilty of homicide. (Post, p. 77.)

Citing: Commonwealth v. Couch, 32 Ky. Law, 638, 106 S. W., 830, 16 L. R. A. (N. S.), 327; People v. Rockwell, 39 Mich., 503; Reg. v. Bennett, Bell C. C., 1; Bishop on Criminal Law (4 Ed.), vol. 2, sec. 705.

9. CRIMINAL LAW. PROXIMATE CAUSE.

Proximate cause does not necessarily mean the last act of cause or nearest act to an injury. (Post, p. 78.)

Citing: Words & Phrases (First Series) vol. 6, pp. 667, 668; Missouri Pac. Ry. Co. v. Moseley (U. S.) 57 Fed. 921, 925, 6 C. C. A., 641; Travelers' Ins. Co. v. Melick (U. S.), 65 Fed., 178, 184, 12 C. C. A., 544, 27 L. R. A., 629; Holwerson v. St. Louis & S. Ry.

Co., 57 S. W., 770, 773, 157 Mo., 216, 50 L. R. A., 850; Watters v. City of Waterloo, 101 N. W., 871, 873, 126 Iowa, 199; Words & Phrases (Second Series), vol. 3, pp. 1330, 1335; Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U. S., 469, 24 L. Ed., 259.

10. **CRIMINAL LAW. CHARGE OF THE COURT. PUNISHMENT.**

It is not error for the court to instruct the jury to fix the punishment of the defendant at some definite period instead of fixing a **maximum** period since a **maximum** period would be a definite period. (Post, p. 80.)

11. **CRIMINAL LAW. PUNISHMENT. PAROLE.**

Where the court instructs the jury to fix the punishment at a definite period, and the jury fixes the punishment at two years, the defendant will be subject to parole at the expiration of one year. (Post, p. 81.)

12. **CRIMINAL LAW. PUNISHMENT. MAXIMUM AND MINIMUM.**

It is suggested that the trial court inform the jury as to the maximum and minimum punishment for the particular crime, and instruct them to fix the **maximum** rather than the **definite** period of time the defendant is to serve. (Post, p. 81.)

*Headnotes 1. Criminal Law, 17 C. J., section 3349; 2. Proximate Cause, 32 Cyc., p. 745; 3. Homicide, 29 C. J., section 136; 4. Homicide, 30 C. J., section 722.

FROM MORGAN.

Appeal from Criminal Court of Morgan County.—Hon. W. H. Buttrom, Judge.

W. Y. Boswell, for plaintiff in error.

Roy H. Beeler, Assistant Attorney-General, for defendant in error.

Mr. Justice McKinney delivered the opinion of the Court.

Plaintiff in error, referred to herein as the defendant, was indicted for the murder of Alfred Johnson. The

jury found him guilty of involuntary manslaughter and fixed his punishment at two years in the penitentiary.

Alfred Johnson, nineteen years of age, his older brother, Walter Johnson, and Jesse Letner, seventeen years of age, half brother of the defendant, were crossing Emory River in a boat from the west to the east side, at a point known as "Devil's Race Track," this being a dangerous place, of unknown depth, where the water circles and eddies continuously. When in the middle of the river some man on the high bluff above the west bank shot into the water about six feet east of the boat, which caused the water to splash up. A second shot was fired, which hit the water nearer the boat; thereupon Walter Johnson, who was steering the boat, jumped out of same into the river, resulting in its being capsized, and Alfred and Walter were drowned.

The only question of fact is were either of these shots fired by defendant? He did not testify, and offered no evidence in his behalf.

Before the accident defendant met Langley on the east side of the river and asked if he had seen his brother, Jesse. Langley replied that Alfred Johnson came down to the river and whistled three times, and that two boys came down to the river, got in a boat and carried him across. Defendant stated that if he found them he would fix them; that they had been stealing his chickens, and had broken into his house and stolen his gun. Langley further testified that defendant crossed the river and sometime thereafter returned with a shotgun, and stated that he had "sunk the boat," or "the boat was sunk." Langley further said that he thought the defendant had a pistol when he came back.

Ferguson testified that the defendant told him that the boys were drowned, and asked him what to do about

it, and stated that he fired one shot, but not at the boys, just to frighten them, and the boat turned over.

Phillips testified that on the day of the accident defendant told him about it, and said he fired a shot, but not at them. That later he came back and asked him not to say anything about what he had told him, as Judge Boswell had told him to keep his mouth shut.

Wilds testified to seeing two men with guns on the bluff where the boys were drowned, and heard some shots, but was too far away to identify the men.

The State introduced Jesse Letner, who detailed the transaction, and testified that while he could not identify the man on the bluff who was doing the shooting he knows it was not his brother. This witness further stated that after getting out of the river on the east side he started up the river, and, after going about 200 feet, he met his brother with a shotgun in his hand. Letner admitted that he told the jury on his direct examination that it was so far that he could not tell who it was that fired the shots. Witness also testified that he and the Johnson boys had stolen his brother's pistol and had it when the boat turned over; that he and the Johnson boys were hiding out on the west side of the river under the bluff; that they ate and slept there, and had been there for sometime; that they were hiding because there were several State warrants out for them.

(1) We find from a preponderance of the testimony that the shots were fired by the defendant.

(2) Error is assigned on the failure of the trial court to quash the indictment.

There is no minute entry showing that the motion to quash was ever called to the attention of the court, or action had on same, in the absence of which it will be presumed that the motion to quash was waived. (3) Fur-

thermore, this matter was not made the basis of a motion for a new trial.

(4) It is also assigned for error that the court improperly charged the jury as follows:

"If you should believe from the evidence, and that beyond a reasonable doubt, that this defendant saw the deceased and other boys in a canoe or boat, and shot into the river near them without any purpose of hitting the deceased, but to play a prank on the deceased, and if the deceased became frightened and jumped into the river and was drowned, then in that event, the defendant would be guilty of involuntary manslaughter."

This was a correct statement of the law, but was inaccurate so far as the facts of this case are concerned. The uncontroverted testimony shows that deceased did not jump out of the boat, but that his brother, Walter, jumped out and, in doing so, capsized the boat and precipitated the deceased into the water. No criticism, however, is made with respect to this feature of the charge.

The act of the defendant, whether he was shooting to kill or only to frighten these boys, was an unlawful one, and comes within the universal rule that every person will be held to contemplate and be responsible for the natural consequences of his own act; but he will not be held criminally responsible for a homicide unless his act can be said to be the cause of death.

(5) When a person unintentionally or accidentally kills another, while engaged in an unlawful act, the authorities all hold that he is guilty of some degree of homicide.

In this case if defendant had accidentally struck the deceased, causing his death, or had capsized the boat and deceased had drowned, unquestionably he would have

been guilty of some grade of homicide. We will cite a few cases to illustrate the principle.

In *State* v. *Radford,* 56 Kan., 591, 44 Pac., 19, it was held that a defendant who willfully and forcibly seizes a boy against his will and protest, and carries him out into a river where the water is deep, whereby he is drowned, is guilty of manslaughter.

In *Adams* v. *People,* 109 Ill., 444, 50 Am. Rep., 617, one was held to be guilty of murder who compelled another to jump from a moving train.

In *Norman* v. *U. S.,* 20 App. (D. C.), 494, where it appeared that defendant, in attempting to make a violent attack upon the deceased, caused her to believe that her life was in danger, and, so believing, she inadvertently fell into a canal and was drowned, defendant was held guilty of murder.

In *Rex* v. *Evans,* referred to in 3 Russell on Crimes; (6 Ed.), p. 12, the prisoner, after beating his wife, threatened to throw her out of the window, and she was so terrified that she threw herself out of the window and was killed. The judges were all of the opinion that if she acted upon a well-grounded apprehension of his doing such further violence as would endanger her life, the prisoner was answerable for the consequences of the fall as much as if he had thrown her out of the window himself.

In *Reg.* v. *Pitts,* Cor. & M., 284, it was said that the defendant was guilty of murder if, because of a well-grounded apprehension of immediate violence occasioned by defendant's guilty act, ·the deceased threw himself into a river and was drowned.

In *Studstill* v. *State,* 7 Ga. 2, defendant was held guilty of murder where he shot at deceased, not believing that the gun would carry so far.

In *Rex* v. *Sullivan*, 7 Cor. & P., 641, a lad was held to be guilty of manslaughter where, in a frolic, without meaning harm to any one, he took the trapstick out of the forepart of a cart, in consequence of which it was upset, and the carman, who was in it, putting in a sack of potatoes, was thrown backward on some stones and killed.

Many other cases could be cited to the same effect.

It is sought to differentiate the foregoing cases from the one here involved upon the theory that the death of deceased was due to an intervening cause, viz.: the capsizing of the boat by the brother of deceased.

(6)  The rule invoked is thus stated in 13 R. C. L., 750:

"Where it appears that the act of the accused was not the proximate cause of the death of the person for whose murder he is being prosecuted, but that another cause intervened, with which he was in no way connected, and but for which death would not have occurred, such supervening cause is a good defense to the charge of homicide."

But, on page 753, it is said:

"Whenever an independent responsible person, disconnected with the defendant, causes some intervening act to be done, the defendant is relieved of responsibility for the consequences thereof, unless the act of intervention is the natural result of the defendant's act."

The same exception to the rule is thus stated in 29 C. J., 1078:

"The unlawful act or omission need not be the sole cause of the death. Thus if defendant's negligence was a cause of the death, it is immaterial that the negligence of the deceased himself or of others also contributed thereto. If an injury caused by defendant contributed to the death, defendant is responsible although a subsequent mortal wound inflicted independently by another

also contributed thereto. Defendant's act or omission need not be the immediate cause of the death, he is responsible if the direct cause results naturally from his conduct. The same is true if the direct cause is an act of the deceased himself reasonably due to defendant's un-, lawful conduct.''

From the foregoing it appears that the defendant is liable even where his act was not the immediate cause of the death, if he was connected with the intervening cause, or if the act of intervention was the natural result of his act.

(7) In other words, the defendant cannot escape the consequences of his wrongful act by relying upon a supervening cause when such cause naturally resulted from his wrongful act.

By firing the gun the defendant caused Walter Johnson to take to the water, resulting in the overturn of the boat and the drowning of Alfred.

Illustrative of this principle the following cases are in point:

*Reddick* v. *Commonwealth,* 17 Ky. L., 1020, 33 S. W., 416, where defendant set fire to a hotel in which deceased lived; *Mayes* v. *People,* 106 Ill., 306, 46 Am. Rep., 698, where defendant threw a beer glass at his wife, breaking a lamp which she was carrying and thereby setting fire to her and fatally burning her; *People* v. *Goodwin,* 1 Wheel. Cr. (N. Y.), 253, where, while fighting, defendant threw deceased and he fell upon a dagger that had been dropped by defendant, who was killed thereby, although defendant had not attempted to use the dagger; *Hendrickson* v. *Com.,* 85 Ky., 281, 3 S. W., 166, 7 Am. St. Rep., 596, and *State* v. *Preslor,* 48 N. C., 421, where such force and violence was used as to cause the wife to leave the house from fear of death or great bodily harm, whereby she

died of exposure; *Belk* v. *People,* 125 Ill., 584, 17 N. E., 744, where the defendants were indicted for negligently driving a team of horses against a carriage in which the decedent was riding, thereby causing the horses to run away, whereby she was thrown to the ground. The carriage was driven by the decedent's son. The court said:

"It may be fairly said that what followed the colliding of the defendants' team with the wagon in which the deceased was riding, was the natural and probable effect of the collision, and the collision was in consequence of the manner in which the team of the defendants was controlled. It can make no difference whether the driver of the team after which the deceased was riding, was guilty of negligence in not controlling or failing to control his team after the collision. It may be that persons standing by, or the driver, might, by the exercise of diligence and care, have checked the horses, and thereby prevented the final catastrophe; but because they did not do so, and were derelict in moral or even legal duty in that regard, will not release defendants from the responsibility of their wrongful act or omission of their legal duty. If the driver, instead of being negligent, as is claimed, in controlling his team, had done some act contributing to the running away of his horses, or driven upon a bank, whereby the carriage had been overturned and the deceased thrown out, or the like, it might justly be said that it was the act of the driver, and not of the defendants, to which the death of the deceased was legally attributable."

(8) In the following cases it was held that death was not attributable to the direct act of the defendant:

*Commonwealth* v. *Couch,* 32 Ky. Law Rep., 638, 106 S. W., 830, 16 L. R. A. (N. S.), 327, where it was held that the mere fact that a pregnant woman, so badly

frightened by the reckless firing of guns on the highway as to cause her to abort shortly thereafter, languished and died, does not render the one responsible for the firing indictable for murder, since the death cannot be said to be the natural or probable result of the fright; *People* v. *Rockwell,* 39 Mich., 503, where defendant knocked deceased down with his fist, and a horse jumped on him or kicked him and thus killed him, it was held that defendant was not liable if there was no connection between his act and the act of the horse, and *Reg.* v. *Bennett,* Bell C. C. 1, commented on in Bishop's Criminal Law (4 Ed.), vol. 2, section 705, where defendant had for years been accustomed to keep and manufacture fireworks in a house in London for sale, in violation of law, and by the supposed negligence of one of his servants, in his absence, there was an explosion and fire by which another's death was caused, defendant was not liable for manslaughter, as the unlawful act of keeping the fireworks was disconnected with the supposed negligence of the servants, which was the proximate cause of the death.

In those cases the wrongful act was held to be remote, while in the instant case the wrongful act of the defendant; that is, firing at or near the boys in the boat, was the proximate cause, the producing cause, the cause that was primarily responsible for the death of deceased.

*(9)* In Words & Phrases (First Series), vol. 6 beginning on page 5767, reference is made to many cases holding, in substance, that "proximate cause" does not necessarily mean the last act of cause or nearest act to an injury.

On page 5768 it is said:

"Proximate cause is not always, nor generally, the act or omission nearest in time or place to the effect it

produces. In the sequence of events there are often many remote or incidental causes nearer in point of time and place to the effect than the efficient moving cause, and yet subordinate to it, and often themselves influenced, if not produced, by it. *Missouri Pac. Ry. Co.* v. *Moseley* (U. S.), 57 Fed., 921, 925, 6 C. C. A., 641; *Travelers' Ins. Co.* v. *Melick* (U. S.), 65 Fed., 178, 184, 12 C. C. A., 544, 27 L. R. A., 629; *Holwerson* v. *St. Louis & S. Ry. Co.*, 57 S. W., 770, 773, 157 Mo., 216, 50 L. R. A., 850."

In the same work (Second Series), vol. 3, p. 1330, it is said:

" 'Proximate cause' means closeness or nearness in point of causal relation. In general terms, it may be said to be the rule of the cases that the *causa proxima* is sufficiently established if the facts are so far connected in orderly sequence as that it can be fairly said that, in the absence of the cause alleged, the injury and damage complained of would not have occurred. *Watters* v. *City of Waterloo,* 101 N. W., 871, 873, 126 Iowa, 199."

And on page 1335 it is said that the "proximate cause" is the dominant cause, the one which necessarily sets the other causes in motion, and without which the injury would not have occurred.

In discussing this question the court, in *Milwaukee & St. Paul Ry. Co.* v. *Kellogg,* 94 U. S., 469, 24 L. Ed., 259, said:

"The primary cause may be the proximate cause of a disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied to the other end, that force being the proximate cause of the movement, or as in the oft cited case of the squib thrown in the market place. *Scott* v. *Shepherd* (Squib Case), 2 W. Bl., 892. The question always is: was there an unbroken connection

between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances.''

In the leading case of *Scott* v. *Shepherd,* referred to above, the defendant was held liable for the wrongful act in originally throwing a lighted squib, made of gunpowder, into an assembly of people, which, after having been thrown about in self defense by other persons, at last put out the plaintiff's eye, upon the principle that he who does the first wrong is answerable for the consequential damages.

The decision in that case is direct authority in support of the conviction in the instant case.

For the reasons stated hereinabove, we are of the opinion that the wrongful act of the defendant, in firing at or near the boys in the boat, was the primary proximate cause of their death; that the act of Walter Johnson in capsizing the boat was the natural result of the wrongful act of defendant, and renders the latter liable for their consequential death.

(10) The last assignment of error is that the court instructed the jury to fix the punishment of the defendant at some *definite* period of time instead of fixing a *maximum* period.

These terms are related in a way, since a maximum time would be a definite time. When the jury fixed a definite period that became the maximum time for which the defendant could be imprisoned. The charge was favorable to the defendant rather than prejudicial.

*(11)* The view entertained by the jury was that the defendant should serve two years, while, under their finding he will be subject to parol at the expiration of a year.

*(12)* We suggest that trial courts inform the jury as to the maximum and minimum punishment for the particular crime, and instruct them to fix the "maximum" rather than the "definite" period of time the defendant is to serve.

The judgment should also provide that the defendant undergo confinement in the penitentiary (in this case) not less than one nor more than two years. As thus modified, the judgment of the trial court will be affirmed.