IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2005

## STATE OF TENNESSEE v. GARY LEE SILCOX

**Direct Appeal from the Criminal Court for Campbell County**
**No. 11423   E. Shayne Sexton, Judge**

---

**No. E2004-02420-CCA-R3-CD - Filed August 29, 2005**

---

The Defendant, Gary Lee Silcox, was convicted of criminally negligent homicide, aggravated assault, and theft of property valued over $1000. The trial court sentenced the Defendant to an effective sentence of ten years. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction for criminally negligent homicide; and (2) the trial court improperly ordered that the Defendant's sentences run consecutively. Finding no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined, JAMES CURWOOD WITT, JR., J., concurring in results only.

Robert W. Scott, for the appellant, Gary Lee Silcox.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William Paul Phillips, District Attorney General; and Michael O. Ripley, Senior Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts
#### A. Facts at Trial

A Campbell County Grand Jury indicted the Defendant on one count of first degree murder, two counts of felony murder, one count of aggravated robbery, and one count of theft of property valued over $1000. At the Defendant's trial, the following evidence was presented: George Stevens testified that, early in the morning on August 31, 2002, he was on Lawson Mountain squirrel hunting when he discovered a man's body. Stevens testified that he noted that the time was 8:00 a.m., and then called 911. On cross-examination, Stevens said that the body was lying on its right side, and a portion of the head was covered with dried blood.

Bobby Vann, a detective with the Sheriff's Department, testified that, on August 31, 2002, he was called to investigate the death of the victim, Ordell Hoover. He said that he went to Lawson Mountain where the victim's body was located. Detective Vann said that he observed the victim's body lying in a wooded area, and he saw some items lying on the ground around the body. The officer said that, in the area around the body, he found: a 7-up can; two syringes; a Fanta can; a Dr. Pepper can; a blood-stained piece of paper; a tree with blood on it; and glass. Detective Vann said that he collected and packaged all of the items that he found, and he sent them to the Tennessee Bureau of Investigation ("TBI") Crime Laboratory. Detective Vann described the victim's body, stating that there appeared to be some injuries on the victim's head and arm. He noticed bruising and scraping on the arms and a "bloody, broken skin wound" on the victim's head. On the victim's body, the detective found a wristwatch and some change.

Detective Vann said that, a short distance south of where the victim was found, there was an "old dumpsite." The officer recovered a "bumper jack" from the dumpsite. The officer explained that a "bumper jack" is a long metal object that is placed underneath the bumper of the car to raise the car. On cross-examination, the detective said there was quite a bit of blood around the head wound. He also said that, on the bumper jack, he saw something that was dark brown in color and some fibers.

Wanda Dople, the Defendant's third cousin, testified that her daughter owns a bar called the Pit Stop. She said that she was working in the bar on August 30, 2002, when the Defendant came in sometime after 6:30 p.m., ordered a beer, asked where the pay phone was located, and then asked for some change to place a call. Dople gave the Defendant, who she described as "sweaty" and "fidgety," change, and the Defendant left the bar a few minutes later. On cross-examination, Dople said that she only saw the Defendant once or twice a year. She said that, when the Defendant came into the Pit Stop, she did not see any blood on him, and she did not recall what he was wearing. She was sure, however, that she would have noticed if he had blood on his clothing. Dople said that she has known the Defendant his whole life, and he does not have a reputation for being a violent person or for stealing.

James Hoover testified that he is the victim's son, and, prior to his father's death, the two were neighbors. Hoover testified that he has known the Defendant for "years" because the Defendant and the victim used to "run around a lot together." Hoover testified that, on August 30, 2002, he saw the victim washing his car around 2:30 p.m., and he noticed that the victim had money in the trunk of his car, including a gallon of gold dollar coins, "two thousand dollar coins," a jar of quarters, nickels and dimes. He saw the victim again around 4:00 or 4:30 p.m., at which time, the victim told him that the Defendant had called the victim and asked the victim to pick up the Defendant and "another guy" in Jellico. Hoover said that, shortly thereafter, the victim left in the victim's 1985 gold Pontiac. Hoover said that, prior to the victim leaving, the two were discussing how to pay for a four-wheeler that they planned to buy. He said that his father told him that he had cash to pay for the four-wheeler and showed him $6,000 that he was carrying in his pocket. After counting the money, the victim put the money back in his wallet, which he kept in his right front

pocket.

Hoover testified that it was not unusual for the victim to leave the house during the day to spend time with the Defendant, but the victim always returned before dark because he could not see at night. Hoover said that, when he returned from work at 6:30 a.m., the victim's car was not in the victim's driveway, so he and his brother went to look for the victim. The victim had previously told Hoover's brother that, if they were ever looking for him, he may be on Lawson Mountain. By the time Hoover picked up his brother and arrived at the mountain, the police had already arrived, and they told him to go to the Sheriff's Office. Hoover said that, on the way back down to Jellico, his brother spotted the victim's car behind a bar called the Pit Stop.

On cross-examination, Hoover said that he could not hear the other end of the phone conversation the victim said he was having with the Defendant. The "other guy" that the victim said was with the Defendant was a man named Ernie Mozingo. Hoover conceded that the victim and Ernie Mozingo had their "ups and downs," and, one time, the victim accused Ernie Mozingo of taking $3500 from him. Hoover explained that Sonya Mozingo[1] asked the victim to come to her house, she coaxed him into bed, and then Ernie Mozingo grabbed his pants and ran away with them. Hoover said that the victim did not see the couple for a while after that incident, but, later, he began seeing them again. Hoover said that, one time, Ernie Mozingo told his mother, the victim's wife, that she should "blow [the victim's] brains out" because the victim was "seeing" Sonya Mozingo. Hoover said that the victim's relationship with Sonya Mozingo caused arguments between the victim and the victim's wife. One time, according to Hoover's testimony, the victim's wife had the victim arrested as a result of one of these arguments.

On redirect-examination, Hoover said that Sonya Mozingo was the Defendant's ex-wife. He also said that, one time, the victim told him that he was working on the furnace of an old house, with the Defendant, and the victim had an envelope with eleven one-hundred dollar bills. The victim told him that he sat on the floor and got the money wet so he took it outside and laid it on the back floor of his car. The victim told him that the Defendant went out to the car, took the money, and then left. Hoover testified that this incident occurred about four months before his father died.

Sandra K. Elkins, the Knox County Medical examiner, testified, as an expert in forensic pathology, about the autopsy that she performed on the victim's body. She said that the causes of the victim's death were blunt force head injuries, which were the result of blows to the head. The doctor said that the victim had several lacerations and bruises to various parts of his head. Under two or three of those areas, there were actual fractures of the skull with the bony parts of the skull penetrating the brain. She said that two of the blows would have resulted in death. The doctor opined that these blows were non-accidental, and the injuries were inflicted by something "in the nature of a baseball bat, a metal pipe, [or] a tire tool." Further, she said that these injuries could have been caused by the bumper jack. Dr. Elkins opined that the victim survived for five or six hours

---

[1]Sonya Mozingo is also referred to as Sonya Bruce or Sonya Silcox. She was previously married to the Defendant, and she is the mother of the Defendant's children.

after he was injured, and, had the victim received medical attention, he might have survived.

On cross-examination, the doctor said that the victim suffered a minimum of five, and a maximum of nine, blows to the head. Dr. Elkins testified that these wounds would have bled profusely, and, if the instrument that caused these blows had not been wiped off, there would still be blood on the instrument. On redirect-examination, the doctor testified that she also found injuries on the victim's hands, which would be consistent with the victim attempting to block the blunt object from striking him.

Laura Green testified that she and the Defendant went to school together, and she also knew of the victim. Green said that, on August 30, 2002, the victim and the Defendant drove by her house in a large car that the victim was driving. Green said that the Defendant had his right foot out the window, and he waved to her. She saw the two around 4:00 or 4:30 p.m., and there was no one else with them in the car. She said that the next time she saw the Defendant was around 6:30 p.m. that same day, when he came into the Pit Stop, and the Defendant used the pay phone and then left. He was at the bar for a total of five minutes. Green said that, when the Defendant left, he looked like he was headed for downtown Jellico. On cross-examination, Green said that the Defendant was wearing a bluish-gray colored shirt, he was "real wet," and he had on shorts.

Johnny Blakenship, an officer with the Jellico Police Department, testified that, on August 31, 2002, at around 12:15 a.m., he recognized the victim's car parked near the Pit Stop. Sammy Franklin, a detective with the Campbell County Sheriff's Office, testified that he went to the Pit Stop to examine the victim's vehicle, and he found some glass in the car. Detective Franklin stated that he gave the glass to Detective Vann. Detective Franklin testified that he interviewed the Defendant's girlfriend, Sonya Thomas,[2] and he retreived the Defendant's tennis shoes and shirt from Thomas' home. John Quel, a Deputy Sheriff in Campbell County, testified that he recovered the victim's keys, which were submerged in a bucket at the corner of the Pit Stop.

Joe Thacker testified that he was currently incarcerated on unresolved charges in Claiborne County, he was in violation of his community corrections in Campbell County, and he had been convicted of numerous felonies. He said that he and the Defendant were cell mates in jail, and, during that time, he heard the Defendant say "that he beat that man with a bumper jack or a tire tool or something and beat his head against a tree." Thacker said that the Defendant did not give a reason why he beat the man. On cross-examination, Thacker testified that, prior to hearing this conversation, he had been in jail for approximately one year. Thacker admitted that he could not remember whether the Defendant said that he beat the victim with a bumper jack or a tire tool.

Jason Inman testified that he had been convicted of several felonies, and he was currently serving a prison sentence. He said that the Defendant was in prison with him, and he heard the Defendant talking about killing someone. Inman testified that several inmates asked the Defendant what had happened, and he overheard the Defendant respond that he beat some guy in the head with

---

[2]From all indications, Sonya Thomas is a different woman than Sonya Bruce/Sonya Mozingo.

a tire iron and then beat his head against a tree "to where they couldn't identify him." Inman said that he was assigned to work detail, and, as part of this assignment, he had to clean up the area around the crime scene in this case. Upon returning after work detail, Inman told the Defendant that the police were still cleaning up the crime scene, and the Defendant asked him if the police had "looked over the bank or anything." The Defendant then told Inman he was concerned about the police looking over the bank. Inman said that he did not know what the Defendant was talking about. On cross-examination, Inman denied that he hoped to get special consideration for offering this information.

Steve Vinsant, a special agent with the TBI, testified that he assisted in this investigation. As part of the investigation, he went to the crime scene with Captain Don Farmer and the Defendant to locate the victim's wallet. He said that, prior to this, the Defendant had been given his Miranda rights. The Defendant directed the officers to the wallet by telling them that they could find the wallet alongside a road that led to the mountain, and the Defendant indicated that he threw the wallet out the window of the car over an embankment. Agent Vinsant said that the wallet contained insurance cards and a driver's license, both bearing the victim's name, but the wallet did not contain any money. The agent said that, in this area, there was also a tree nearby with a large mark on it, which looked like it was caused by the bumper jack being thrown against the tree. On cross-examination, the agent said that he went to the mountain with the Defendant on Sunday, September 1, 2002, which was the day after the body was found. Agent Vinsant said that the Defendant mentioned that someone by the name of "Danny" was involved with this crime, but the agent later determined that "Danny" did not exist. The agent said that, inside the tree trunk, he found a blanket, a bumper jack, an axe, and an eight-inch purple "dildo." The trunk also contained a license tag, an old tire, antifreeze, various bottles of wax and polishes, and a gasoline container.

Don Farmer, the Captain of the detectives for the Campbell County Sheriff's Office, testified that he assisted in this investigation, and, as part of the investigation, he learned that the Defendant had an outstanding arrest warrant for nonpayment of child support. On cross-examination, Captain Farmer testified that the victim's family told him that the victim had a considerable amount of money, but the captain was unable to verify this information.

Randall Nelson, a forensic scientist with the TBI Crime Laboratory, testified as an expert that he examined two samples of glass, one collected from the crime scene and the other collected from the victim's car. He determined that the two pieces came from the same source of glass.

David Hoover, a forensic scientist in the TBI Crime Laboratory, testified as an expert that he examined three soda cans, a bumper jack, and known finger impressions of both the victim and the Defendant. He said that he found two identifiable latent prints on the soda can, and they belonged to the Defendant. Agent Hoover testified that he found one identifiable fingerprint on the head of the bumper jack, and the print did not match either the victim or the Defendant. The agent said that he found the Defendant's fingerprints inside the victim's car on the passenger side seat buckle and on two pieces of paper found in the glove box. On cross-examination, Agent Hoover testified that he was sent only the victim's and the defendant's fingerprints for comparison purposes.

Michael Tuberville, a forensic scientist with the TBI Crime Laboratory, testified as an expert that he tested blood found on the Defendant's tank top, blue jeans, tennis shoes, and the tree trunk. From the tests, Agent Tuberville discovered that the blood on the tree trunk was from the victim. The agent said that he also found the victim's blood on the Defendant's tank top and tennis shoes, and on a piece of paper found at the crime scene. Agent Tuberville found only the Defendant's blood on the Defendant's jeans. The agent also found human blood from an unknown female on the bottom of two soda cans found at the crime scene. The agent said that he did not find any blood on the bumper jack, but he did find the victim's blood on the exterior of the car, on glass in the front passenger's seat, and on the fabric of the driver's seat. The agent opined that the blood stains on the exterior of the car were "medium velocity impact stains," meaning that the pattern looked like it was from where someone was bludgeoned and the blood impacted the car surface. Agent Tuberville further testified that on the bumper of the car there appeared to be an area where someone had attempted to wipe off the blood.

Agent Vinsant was recalled and testified that he interviewed the Defendant. Prior to this interview, he went to the Defendant's house with two other agents. Agent Vinsant testified that when the three arrived, the Defendant recognized them as police officers and ran. The Defendant told the officers that he ran because there was an outstanding warrant for him for failing to pay child support. The Defendant told the agent that he had not seen the victim in over a month and that no one from his house called the Defendant on the day of the murder. Agent Vinsant testified that the Defendant said that he was no longer friends with the victim because the victim was having a relationship with the Defendant's ex-wife. The Defendant denied any involvement in the victim's murder. The Defendant told the agent that he was not employed and that the last time he earned money was when he put in a car starter for a woman, and she paid him $25.00. Agent Vinsant stated that the Defendant had over $350.00 on his person, and when questioned about this, the Defendant said that he sold an engine to his cousin. This interview took place on August 31, 2002, the day that the victim was found dead.

Agent Vinsant testified that the Defendant was interviewed again later on the same day, after being advised of his Miranda rights. The agent said that he confronted the Defendant with witness statements that the Defendant had been with the victim on August 30, the day that this crime occurred. The Defendant continued to deny that he was with the victim. When the agent told the Defendant that he could obtain the phone records from the Defendant's house, the Defendant told him that a man named "Danny" had come to his house and had called the victim from the Defendant's house. The Defendant said that "Danny" asked for drugs, and the victim agreed to meet "Danny" at the Defendant's home and provide him drugs. The Defendant then told the agent that, when the victim arrived, "Danny" hit the victim with a tire iron. He said that he tried to help the victim, but he could not. The Defendant told Agent Vinsant that "Danny" and the victim were arguing over money. The Defendant said that "Danny" and the victim then drove off together. When reminded that witnesses saw the Defendant in the car with the victim, the Defendant said that he rode in the car with "Danny" and the victim, but he got out at a truck stop.

Detective Franklin was recalled and testified that he interviewed the Defendant the following day, on September 1, 2002. Detective Franklin testified that the Defendant said that he called the victim at around 4 p.m. on the day of the murder, and the two discussed work that the Defendant could do, and the victim then came to pick him up. The Defendant said that he and the victim went to Jellico and then up a steep hill, and the victim said that he was going to a graveyard to clean some brush off. The Defendant said that, when they arrived, the victim then asked the Defendant to give him oral sex in exchange for fifty dollars, and he told the Defendant that if he let the victim do "something else" the victim would give him "a little more." The Defendant stated that the victim then got out a blanket and a purple "dildo," and the Defendant told the victim that he would not engage in any sexual activity with him. Detective Franklin testified that the Defendant said that he began to walk off and the victim grabbed him by the arm and pushed him back. The Defendant said that the victim picked up his blanket and threw it in the car trunk, and told the Defendant that he had better not say anything. The Defendant said that he pushed the victim backwards, and the victim hit his head, but the Defendant did not know how bad the victim hit his head. Detective Franklin testified that the Defendant said that he got in the car, and the victim was mad and tried to get into the car, so the Defendant locked the car. The Defendant said that he then started the car, drove off, and parked the car "at the bottom." The Defendant said that he went into the bar, got some change, and called his girlfriend. The Defendant said that he was scared because he did not know that the victim was hurt, or that he had died. The Defendant then went to his girlfriend's house. Detective Franklin testified that the Defendant denied taking the victim's wallet and denied looking in the trunk of the victim's car.

Detective Franklin testified that, in another interview, the Defendant told him that the Defendant threw the blanket in the tree trunk. The Defendant said that, during the confrontation, the victim scratched the Defendant's arm. The Defendant said that, when the victim "kept grabbing at" him, he took the victim's head and hit it against the tree twice. The Defendant said that the car keys were locked inside the car, and so he kicked out the passenger's side window, entered the car, and drove the car away. The Defendant told the detective that he then went to the bar, and, when he arrived, he put the keys to the car in a bucket. The Defendant again denied taking the victim's wallet. The Defendant told Detective Franklin that he asked to borrow four quarters, and he called his mother. He said he was feeling scared because "a big man . . . pull[ed] out a dildo on [him]."

On cross-examination, Detective Franklin testified that, during the course of the interviews, the officers pointed out to the Defendant inconsistencies between the Defendant's statement and other witnesses' statements. Detective Franklin testified that he never attempted to contact the Defendant's cousin, who was the man that the Defendant said that he sold a motor to for $350.00.

The Defendant testified that he only achieved ninth grade in school, and he could barely read or write. He said that he was previously married to Sonya Bruce, but the two had been divorced for twelve years. The Defendant said that he and Bruce had children together, and the children lived with Bruce's mother. He admitted that he owed Bruce's mother child support. The Defendant said that Bruce was now married to Ernie Mozingo, and he said that he did not associate with either of

the two on a regular basis.

The Defendant testified that the victim was a good friend of his, and the two had known each other for more than ten years. The Defendant denied taking money from the victim and stated that the victim never accused him of taking any money. The Defendant testified about the events that occurred on August 30, saying that he ran into the victim, Ernie Mozingo, and Adam King in a parking lot. The victim asked the Defendant if he wanted to go up to the mountain to help him clean a graveyard, but the Defendant declined to go immediately because he had to go to his mother's house. The victim told the Defendant to call him later, when he was ready to go clean, and the Defendant called the victim at around 4:00 p.m. that day. The Defendant said that the victim came and picked him up and that Ernie Monzingo and Adam King were both in the car. The Defendant testified that the four went to Lawson Mountain, and, after they arrived, Monzingo and King got a blanket out of the trunk of the car and went up the road and around a tree. The Defendant testified that the victim asked Monzingo and King where they were going with "that," and the victim told them to come back. According to the Defendant, Monzingo and King kept going, and the victim did not follow them.

The Defendant testified that the victim then approached him and requested that the Defendant perform oral sex on him. The Defendant declined. The Defendant testified that the victim then asked the Defendant if he would allow the victim to anally penetrate him with a sex toy, and the Defendant again declined. The Defendant said that the victim then grabbed his arm, pushed him and scratched him, and the Defendant pushed the victim down, and the victim hit his head. The Defendant said that he attempted to get into the car, which he was able to do by breaking a window. According to the Defendant, the victim pursued the Defendant, and the Defendant pushed him down again, and the victim hit a tree. The Defendant said that he got in the car and left, but when he did so the victim was alive. The Defendant testified that, as this confrontation was occurring, the victim said to the Defendant, "I'll blow your f***ing brains out, you son of a b****." The Defendant left, but he returned shortly thereafter because he wanted to check on the victim. The Defendant testified that, when he returned, he saw that Monzingo and King had approached the victim and started beating him. When Monzingo and King saw that the Defendant was watching them, they said to the Defendant, "If you don't take us off this mountain . . . we'll kill you, you son of a b****." The Defendant denied ever hitting the victim with a bumper jack. The Defendant said that, as he was leaving, he threw the victim's billfold out of the window. The Defendant then called his mother from a pay phone, and his mother came and got him.

The Defendant explained that he did not implicate Monzingo and King in this crime because he was scared that the two men would retaliate by hurting his family. The Defendant denied taking any money from the victim, and he said that he sold a motor to his uncle to get the money that the police found in his wallet. The Defendant testified that his uncle was going to testify on his behalf, but that his uncle recently died. The Defendant identified an obituary confirming that his uncle had died.

On cross-examination, the Defendant admitted that he had taken the victim's car and car

keys, but he said he did so because he was scared. The Defendant also admitted that he left the victim as the victim was being beaten to death by two men. The Defendant testified that he owes $11,000 in child support, and he knew that he had missed a court date pertaining to the child support. The Defendant conceded that he had previously lied to police about seeing the victim on the day of the murder.

Sonya Bruce Monzingo testified that she is married to Ernie Monzingo, and she was formerly married to the Defendant. Sonya Monzingo testified that she and the victim had a sexual relationship at one time, but she said that she had not had sex with the victim for five years prior to his death. She admitted that she told police that she exchanged sex with the victim for drugs, and the victim had recently paid her $50.00 to convince another woman to have sex with him. Sonya Monzingo testified that, a couple of times, the victim attempted to force his way into her home. In response, Ernie Monzingo "exchanged words" with the victim, and he told the victim to stay away from Sonya Monzingo. She denied that this occurred the day before the victim's murder. Monzingo testified that she called the victim's son and daughter the day that the victim's body was found, and she told them that she was not involved in this murder. Monzingo admitted that she called the Defendant's girlfriend and hung up before speaking, but she denied that she discussed this murder with the Defendant's girlfriend. On cross-examination, Sonya Monzingo testified that the Defendant and the victim had a sexual relationship with each other, and she saw the two engaging in sexual activities on two or three occasions. On redirect examination, Monzingo admitted that the victim had accused her and her husband with theft, but the grand jury did not indict them.

Sonya Elmore testified that she dated the Defendant for approximately two years, and the Defendant came to her house the evening before the victim's body was found. She said that she did not recall anything unusual about that evening, and the Defendant did not wash his clothes. Elmore denied that one month later she had a conversation with Sonya Monzingo about this murder. On cross-examination, Elmore said that she gave the police permission to search her home, and they took a black shirt and tennis shoes that belonged to the Defendant.

Ernie Mozingo testified that the victim's relationship with his wife, Sonya Mozingo, had been an issue in their marriage. Mozingo testified that he had previously told the victim that, if the victim did not leave his house, he would "whoop him." He admitted that the victim charged him with theft, and he said that this occurred after Mozingo threw the victim out of Mozingo's house when the victim propositioned Ernie Mozingo. On cross-examination, Mozingo denied that he beat the victim to death. Further, he said that he "briefly" knew a man named Adam King, but he never went to Lawson Mountain with him.

Based upon these facts, the jury convicted the Defendant of aggravated assault, criminally negligent homicide, and theft of property valued over $1,000.

## B. Facts at Sentencing Hearing

At the Defendant's sentencing hearing the trial court admitted into evidence and considered

the Defendant's presentence report. The parties agreed that the Defendant was a Range I, standard offender. James Hoover, the victim's son, testified that the Defendant never apologized to him or to his family, and he thought that the Defendant should be punished to the "fullest for what he did." On cross-examination, Hoover admitted that he thought that the Mozingos participated in this crime. Robin Mefford, the victim's daughter, testified that the Defendant should be given life in prison for leaving her father and expressing no remorse.

Mildred Silcox, the Defendant's mother, testified that, prior to this crime, the Defendant lived with her. She said that, if and when the Defendant is released, he will again live with her. Silcox said that the Defendant was sick prior to this crime, and he had to undergo three operations. She said that his spleen still needed to be removed. Silcox described the Defendant as a "good boy," who helps her care for her handicapped grandchild. She said that the Defendant had stopped drinking, and he has been looking for employment as a mechanic. On cross-examination, Silcox admitted that the thirty-two years old Defendant has never maintained any regular employment. She testified that the Defendant previously abused drugs.

David Rose testified that he is married to the Defendant's aunt. Rose testified that the Defendant is "good-hearted" and was never a trouble maker. He said that he and his wife will employ the Defendant if the Defendant is released.

The trial court sentenced the Defendant to two years for the criminally negligent homicide conviction, three years for the theft of property conviction, and five years for the aggravated assault conviction. Further, the trial court ordered that all of the sentences be served consecutively to each other, for an effective sentence of ten years.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction for criminally negligent homicide; and (2) the trial court improperly ordered that the Defendant's sentences run consecutively.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for criminally negligent homicide. To establish criminally negligent homicide, the State must prove three elements beyond a reasonable doubt: (1) criminally negligent conduct on the part of the accused; (2) that proximately causes; (3) a person's death. State v. Jones, 151 S.W.3d 494, 498-99 (Tenn. 2004) (citing State v. Farner, 66 S.W.3d 188, 199 (Tenn. 2001); Tenn. Code Ann. § 39-13-212(a)). The Defendant contends that the evidence is insufficient to sustain his conviction for criminally negligent homicide because the evidence does not establish that the Defendant engaged in any negligent conduct. The State counters that the proof establishes that the Defendant committed "gross negligence" when he injured the victim and then stole the victim's car, leaving the victim on the mountain to die.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (quoting State v. Smith 24 S.W.3d 274, 279 (Tenn. 2000). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Criminally negligent homicide is defined as "[c]riminally negligent conduct which results in death." Tenn. Code Ann. § 39-13-212(a) (2003). A person acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. Jones, 151 S.W.3d at 499. "The risk must be of such a nature and degree that the failure to perceive it constitutes a *gross deviation from the standard of care* that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]" Id. (quoting Tenn. Code Ann. § 39-11-106(a)(4) (2003)). To be criminally negligent, a defendant must fail to perceive a substantial and unjustifiable risk. Tenn. Code Ann. § 39-11-106(a)(4); see also State v. Owens, 820 S.W.2d 757, 760 (Tenn. Crim. App. 1991). Whether the defendant failed to perceive the risk must be determined using a subjective standard, viewing the circumstances from the accused person's standpoint. Tenn. Code Ann. § 39-11-106(a)(4); see also State v. Slater, 841 S.W.2d 841, 842 (Tenn. Crim. App. 1992) (stating that the criminally negligent homicide statute "views the situation through the eyes of the [defendant] and whether he could have perceived and then chosen to ignore a 'substantial and unjustifiable risk'"). The defendant's failure to perceive the risk must be a "gross deviation from the standard of care." Tenn. Code Ann. § 39-11-106(a)(4). The Tennessee Supreme Court has held that:

> In sum, we must examine the defendant's conduct to determine (1) whether a substantial and unjustifiable risk existed at the time of the conduct or resulting from the conduct; (2) whether, using a subjective standard, the defendant failed at the time of the conduct to perceive the risk; and (3) whether that failure was a gross deviation from the standard of care of an ordinary person under the circumstances.

Jones, 151 S.W.3d at 500.

Tennessee courts have sustained convictions for criminally negligent homicide only where a "risk is of such a nature and degree that injury or death is likely and foreseeable." State v. Gillon, 15 S.W.3d 492, 498 (Tenn. Crim. App. 1997). For example, in State v. Goodwin, a jury found the defendant guilty of criminally negligent homicide where the defendant had left a cocked shotgun in the woods fifty feet behind a house in a crowded neighborhood. Two children found the gun; it accidentally discharged, killing one child and severely injuring the other. Concluding that the defendant had "exercised extremely poor judgment in his handling of an inherently dangerous weapon," the Tennessee Supreme Court affirmed the judgment. 143 S.W.3d at 779; see also State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994) (defendant guilty of criminal negligence in firing a gun in the general direction of another person); State v. Butler, 880 S.W.2d 395, 396-97 (Tenn. Crim. App. 1994) (defendant guilty of criminal negligence in accidental shooting). In State v. Adams, this Court held that a defendant was criminally negligent for inflicting blunt trauma wounds to her niece's head, resulting in the victim's death. 916 S.W.2d 471, 476-77 (Tenn. Crim. App. 1995).

The Defendant's conduct also must be the proximate cause of the ensuing death. Goodwin, 143 S.W.3d at 778-79; State v. Farner, 66 S.W.3d 188, 199 (Tenn. 2001). In other words, the victim's death needs to be the natural and probable result of the defendant's unlawful conduct. Id. at 779. However, the defendant's actions "need not be the sole or immediate cause of the victim's death." Farner, 66 S.W.3d at 203 (citing Letner v. State, 156 Tenn. 68, 299 S.W. 1049, 1051 (1927)). If the direct cause of the death is an act of the victim or third party, the defendant may still be liable if the act of the victim or third party is a natural and probable result of the defendant's conduct. See Letner, 299 S.W. at 1051; Cole v. State, 512 S.W.2d 598 (Tenn. Crim. App. 1974).

The evidence, viewed in the light most favorable to the State, proved that the Defendant hit the victim's head against a tree multiple times, to the point that the victim suffered blunt trauma head wounds and lay bleeding. The Defendant then, while the victim was still alive, stole the victim's car and left the victim on the mountain alone. The Defendant left the Defendant alone and without transportation, and the Defendant did not call emergency services to aid the victim. On these facts, a rational jury could have found that the Defendant's actions constituted a "gross deviation from the standard of care that an ordinary person would exercise" and that he knew or should have known that his conduct or the result of that conduct would imperil the life of another.

Likewise, a rational jury could have found that the Defendant's conduct was the proximate cause of the victim's death. The Defendant set into motion the chain of events that led to the victim's death, and the chain of events was a natural and probable consequence of the Defendant's conduct. There was medical expert testimony at trial that, had the victim received emergency medical attention, he might have survived. The Defendant created a situation that prevented the victim from receiving medical attention. For these reasons, we conclude that the evidence is sufficient to support the Defendant's conviction for criminally negligent homicide.

## B. Consecutive Sentencing

The Defendant next contends that the trial court erred when it ordered him to serve consecutive sentences and when it denied him alternative sentencing. The State asserts first that this issue is waived and, even if not waived, it is without merit. Initially, we note that the Defendant has waived the issue by failing to reference or cite any authority to support his contention in his brief to this Court. Under Rule 10(b) of the Rules of the Court of Criminal Appeals, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Accordingly, the Defendant has waived his claim for relief by failing to provide any references to the record; however, we will nonetheless proceed to address the Defendant's claims on their merits.

When a defendant challenges the length, range or the manner of service of a sentence, it is the duty of this Court to conduct a <u>de novo</u> review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" <u>State v. Ross</u>, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting <u>State v. Pettus</u>, 986 S.W.2d 540, 543 (Tenn. 1999)); <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. <u>State v. Dean</u>, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); <u>State v. Butler</u>, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); <u>State v. Smith</u> 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a <u>de novo</u> review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or statutory enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); <u>State v. Taylor</u>, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

### 1. Alternate Sentence

The determination of whether a defendant is entitled to alternative sentencing or probation relies on different burdens of proof. <u>See</u> <u>State v. Boggs</u>, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). A defendant is eligible for alternative sentencing if the sentence actually imposed is eight years or less. Tenn. Code Ann. § 40-35-303(a) (2003). A defendant who is a standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(b)(6) (2003). In determining whether to grant or deny probation, the trial court may consider the following: the circumstances of the offense; the defendant's criminal record; background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity;

and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The Defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169. The presumption in favor of alternative sentencing may be overcome by facts contained in the presentence report, evidence presented by the State, the testimony of the accused or a defense witness, or any other source, provided it is made part of the record. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Sentences involving confinement should be based upon the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103 (2003).

In the case under submission, the record evinces that the trial court considered these factors when it sentenced the Defendant. In denying alternative sentencing, the trial court explained:

> There is a presumption that based on . . . the class of the conviction, [the Defendant] is presumed to be a good candidate for alternative sentencing . . . . However, that presumption can be set aside if the Court finds certain evidence to justify that course.
>
> . . . . .
>
> In looking at . . . [the Defendant's] case, I see no evidence that [the Defendant] is able to provide any assistance – subsistence to himself or anyone that has counted on him. It has been brought to the Court's attention today and also came out possibly through pretrial matters that the [D]efendant had child support obligations [with] which he fails to comply.
>
> His mother has testified that he has trade experience, that he understands the value of work and understands – or actually understands how to work and has some skills to provide but has failed in the past and has shown no willingness today or in the . . . near past that he intends to take care of himself by working, by seeking gainful employment and by taking care of the people that, of course, count on him.
>
> Therefore, I find that although he is a . . . presumed candidate for alternative sentencing, that presumption has been overridden by the evidence in the case by the showing – and the State's evidence here today, and a failure by the [D]efendant to

-14-

show any, any qualities that would make him a good candidate for some kind of release.

We conclude that the evidence does not preponderate against the trial court's denial of an alternative sentence. The trial court considered the Defendant's work history and the Defendant's inability to provide for himself or for his family. The trial court also considered that the Defendant had continually refused to pay the court ordered child support. The Defendant has offered no proof to show how the trial court erred. In the absence of such proof, we conclude that the evidence does not preponderate against the trial court's determination as to the manner of service of the Defendant's sentence.

## 2. Consecutive Sentences

The Defendant also contends that the trial court erred when it ordered that his sentences be served consecutively. When determining whether the Defendant's sentences should be served consecutively or concurrently, the trial court stated:

Now, the question becomes how these sentences are to run, consecutive[ly] or concurrent[ly]. The State has asked this Court to impose consecutive sentencing, based on 40-35-115 subsection 4, that the [D]efendant is a dangerous offender. And it is clear that the record must establish that the [D]efendant's behavior indicated little or no regard for human life and [the Defendant] did not hesitate about committing a crime in which the risk to human life was high. Based on the evidence that was presented at trial, the Court finds that that section has been established. Also, the circumstances surrounding the commission of the offense were aggravated. The evidence at trial also supported that – supports that particular condition.

Part (c), confinement for an extended period of time is necessary to protect society. I think that – no question in this case that [the Defendant] stands as a dangerous offender if he is on release. I believe that the proper thing in this case is to extend that confinement to make sure that society is protected from the likes of [the Defendant].

And the length of the sentences – part (d) of that analysis, the length of the sentence must reasonably relate to the offense of which the [D]efendant stands convicted. Class C, Class D and Class E felonies, three separate felonies, one of which is clearly a violent offense, the other in this particular Count One, aggravated assault, is clearly a violent offense. . . .

Count Number Three, criminally negligent homicide, of course, is a homicide; a person lost his life in this particular case, and the Jury found that . . . [the Defendant] was criminally liable for that act. The Court finds that a ten-year sentence in this particular case would reasonably relate to the offenses for which [the

-15-

Defendant has been convicted.

Therefore, the Court will find that all of these sentences will run consecutive to one another for an effective ten-year sentence, to be served in the Tennessee Department of Corrections custody. . .

Tennessee Code Annotated section 40-35-115(a) (2003) mandates that if a defendant is convicted of more than one criminal offense, the court shall order the sentences to run either consecutively or concurrently. The trial court may order sentences to run consecutively if the court finds by a preponderance of the evidence that one or more of the seven criteria enumerated in Tennessee Code Annotated section 40-35-115(b) apply. If none of the criteria in subsection (b) apply, the "[s]entences shall be ordered to run concurrently . . . ." Tenn. Code Ann. § 40-35-115(d). One criterion listed in Tennessee Code Annotated section 40-35-115(b) is that the "defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). The trial court found that the evidence presented established this criterion, and it therefore ordered that the Defendant's sentences run consecutively. The Defendant has failed to prove that the evidence preponderates against these findings. Accordingly, we find no error in the consecutive nature of the Defendant's sentences.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we find that there exists no reversible error in the judgments of the trial court. Accordingly, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE