IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 29, 2019

**STATE OF TENNESSEE v. TOMMY LYNN RUTHERFORD**

**Appeal from the Criminal Court for Union County**
**No. 4886      E. Shayne Sexton, Judge**

_____

**No. E2019-00063-CCA-R3-CD**

_____

The Defendant, Tommy Lynn Rutherford, appeals his convictions for second degree murder and tampering with evidence, for which he received an effective thirty-seven-year sentence. On appeal, the Defendant asserts that the evidence is insufficient to support his conviction for second degree murder and that he is entitled to a new trial due to the short amount of time during which the jury deliberated before returning the guilty verdicts. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Dan Korth, Knoxville, Tennessee, for the appellant, Tommy Lynn Rutherford.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Jared R. Effler, District Attorney General; and Tyler Hurst, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The evidence presented at trial established that on February 1, 2014, the Defendant injected the victim, Teresa Abner, with Oxymorphone, a Schedule II controlled substance, and the victim died from an overdose of the drug. Once the Defendant discovered the deceased victim, he threw the syringe and the needle used to inject the victim into a small fire.

Shortly after 7:00 p.m. in February 1, Sergeant Tim Johnson of the Union County Sheriff's Office was dispatched to the Defendant's camper in response to a report of an unresponsive female. When Sergeant Johnson arrived, the Defendant was standing outside the camper, and the door to the camper was open. Sergeant Johnson testified that the Defendant stated that the victim had driven up his driveway and asked him if she could park her car there so she could sleep in it. The Defendant told her that she could sleep in his camper. Sergeant Johnson stated that the Defendant first denied knowing who the victim was but that the Defendant later identified the victim as "Teresa" and provided the name of the street where she lived.

Sergeant Johnson stated that while standing outside, he could see the victim's feet inside the camper from the open doorway. The Defendant told him that the victim was in the same position in which the Defendant had found her. Sergeant Johnson entered the camper and found the victim on the couch behind the door. He identified photographs depicting the victim sitting on the couch while slumped down. The victim's sleeves were rolled up, and her right arm and right hand were out away from her body with her inner arm and palm lying face up. Sergeant Johnson testified that the victim did not have a pulse and felt cold and clammy and that her head had begun to stiffen. He contacted emergency medical personnel, who were unable to detect a heartbeat or any signs of life.

Sergeant Johnson again spoke to the Defendant and asked him what had occurred. The Defendant said that before the victim arrived, he had been cleaning up and burning items in a fire outside the camper. The Defendant said he told the victim that she could sleep in his camper and that his sister called and invited him to eat dinner with her. He said he found in the victim in the camper when he returned. When Sergeant Johnson asked the Defendant if drugs were involved, the Defendant responded that he and the victim had shared a needle. Sergeant Johnson testified that the Defendant did not state that he had injected the victim with drugs. On cross-examination, Sergeant Johnson testified that when he arrived at the scene, the Defendant did not seem nervous or scared but appeared calm.

Detective Eddie Muncey and Detective Kenneth Crider of the Union County Sheriff's Office responded to the scene. They entered the Defendant's camper to view the victim's body and obtained the Defendant's consent to search the camper. They photographed the victim's body, and Detective Muncey observed what appeared to be a needle mark on one of the victim's hands. During the search of the camper, the detectives located a syringe inside a cabinet.

After searching the camper, the detectives asked the Defendant to speak with them, and the Defendant agreed to do so. The interview occurred inside Detective Muncey's vehicle with Detective Muncey sitting in the driver's seat, the Defendant

sitting in the front passenger seat, and Detective Crider sitting in the backseat. Detective Muncey advised the Defendant that he was not under arrest and was free to leave. After the Defendant told the detectives about the events, Detective Muncey took a written statement from the Defendant during which the Defendant described the events again while Detective Muncey wrote down what the Defendant said.

According to the Defendant's written statement, the victim drove up his driveway while the Defendant was lying on the couch inside his camper. The Defendant said the victim asked if she could park in his driveway so that she could sleep in her car. The Defendant told her that she could sleep in the camper. During the exchange, the Defendant referred to the victim as "Connie," and the victim corrected him, stating that her name was "Teresa." He stated that he and the victim spoke briefly inside the camper before going to Tolliver's Market to purchase cigarettes. He said the victim drove to the store and was able to drive "fine." Upon returning to the camper, the victim retrieved a "yellow pill," which the Defendant believed to be "a 40," from her purse. They were planning to inject the pill into their veins, and they initially sat down at the table to do so. The Defendant stated that the victim told him that he "would have to shoot her, she couldn't," which meant "she couldn't hit the vein with the needle the pill was in." He said that they sat down on the couch, that the victim laid her right arm on his leg, that he injected a portion of the pill into the victim's right arm, and that he then injected himself with the remaining portion of the pill. He stated that they talked for around fifteen minutes and that he went outside to do yardwork. After some time passed, the Defendant went to his home to get something to eat and drink. He stated that he then returned to the camper where he found the victim slumped over on the couch. He attempted to awaken her and splashed her face with water, but she did not respond. The Defendant said he went to his home where he called 911, returned to the camper, and threw the needle that they had used into a small fire burning outside. He explained that he discarded the needle because he was afraid and was on parole.

Detective Muncey testified that he read the statement back to the Defendant and gave the Defendant the opportunity to make any changes. When Detective Muncey asked the Defendant to sign the statement and to initial each page, the Defendant responded, "I've screwed myself, haven't I." The Defendant declined to sign the statement and said he refused to do so because he did not want to be charged with murder. Detective Muncey stated that the Defendant was not under arrest and was allowed to exit the vehicle after providing the statement. Detective Crider searched the burn pile and located the needle.

Detective Muncey later prepared a warrant for the Defendant's arrest for the offense of tampering with the evidence. Detective Muncey was waiting on the results of the victim's autopsy to see if a Schedule II narcotic was in the victim's system before

arresting the Defendant for murder. Detective Muncey and another officer spoke to the Defendant at the jail on February 10. The Defendant waived his rights and agreed to speak with the officers. After the Defendant gave an oral statement, he repeated the statement, which Detective Muncey reduced to writing. Detective Muncey then read the statement back to the Defendant, and the Defendant signed the statement and initialed each page.

According to this second written statement, the Defendant was resting in his camper after doing yardwork when he heard a car drive into his driveway. He looked outside and saw a black car parked in his yard. He walked outside and spoke to the driver whom he identified as the victim. While speaking to the victim, he called her "Connie," and she corrected him. The Defendant stated that the victim asked him where she could find Xanax pills, and the Defendant told her that he did not take Xanax because it made him fall asleep. The victim asked the Defendant for a cigarette. The Defendant only had rolled cigarettes, which the victim did not want, so she told the Defendant to come with her to purchase cigarettes. They went to Tolliver's Market, and the Defendant remained inside the victim's car while the victim went inside to use the ATM and purchase cigarettes. The Defendant said that the victim then drove to another area of the parking lot and told him that she was going to purchase a pill from someone. After they had waited for five to ten minutes, a man drove up; the victim exited her vehicle and approached the man; and when the victim returned, she and the Defendant headed back to the Defendant's camper. The Defendant stated that the victim showed him one and one-quarter of a pill wrapped in a cigarette cellophane wrapper.

The Defendant stated that upon returning to his camper, he cut a can to use to melt the pill while the victim cut the pill with scissors. One of them put water into the can, and the Defendant held the flame from a lighter underneath the can while the victim put the cut-up pill into the can to melt. The Defendant said the victim told him that "the pills were 40 Opanas." He stated that the victim brought a "needle" with her and that he had a "needle" in the camper. They drew "the pills up into the needles" at the same time, and the Defendant shot the pill into his right arm. The Defendant stated that the victim attempted to inject herself but was unable to "hit a vein." She complained that it was too dark in the room, and the Defendant told her to go next to the door where there was more light. The Defendant said that the victim went next to the door and attempted to inject herself in her hand, but that she missed the vein again and began cursing. The Defendant asked the victim if she wanted him to "hit her, meaning to give her the pill in the arm by needle." The victim said she did; they sat on the couch; and the victim laid her arm on the Defendant's right leg and handed the needle to him. The Defendant stated that he injected the victim in her arm with the melted pill that was in the "needle." He also stated that they both had one "hundred unit needles" and that he "shot [the victim] with around what looked to be 65 units of the pill that was in the needle." The Defendant and

the victim were "high" and talked for some time. Some of the melted pill remained in the can, and the Defendant asked the victim if he could have "another shot." The victim refused, stating that she had paid almost $100.00 for the pill.

The Defendant stated that he went outside while the victim sat back on the couch and "put her head down leaned over." After walking around outside, the Defendant went to his daughter's home located beside the camper to get a drink. He stated that while walking to his daughter's home, he looked toward the camper and did not see the victim. After leaving his daughter's home, he returned to the camper to see if the victim wanted something to eat. He said that the victim was leaned over on the couch and that he could not awaken her. He stated that he was afraid because he had recently failed a drug test and his probation officer threatened to return him to jail if he continued to use drugs. The Defendant's cell phone had gotten wet on the kitchen table, so he went to his daughter's house and used her cell phone to call 911. He said that he returned to the camper and threw the needles, the can, and the "old lighters," into a fire that was burning outside. He did not know whether anymore "dope" was left in the can when he threw it into the fire.

The day after the Defendant gave his second statement, jail officials notified Detective Muncey that the Defendant wished to speak with him. After the Defendant completed an inmate request form, Detective Muncey returned to the jail where the Defendant waived his rights and agreed to speak with him. Detective Muncey testified that the Defendant stated that he wanted to tell him the "whole truth."

The Defendant gave a third written statement in which he said he wanted to "clear some things up that [he] wasn't honest with on the second statement" and that he wanted to "tell the truth" about how he and the victim obtained the pills. He stated that when he told the victim that he did not know where she could purchase Xanax, she asked him if he knew where she could purchase "anything else." The Defendant called someone but was unable to obtain pills from that person. The victim told the Defendant that she knew someone but did not have the person's telephone number. She asked the Defendant to ride with her to a location, and he agreed.

The Defendant stated that the victim drove to an apartment complex and entered an apartment while the Defendant remained in her car. After five to ten minutes, the victim returned with another man. The victim drove to Tolliver's Market and entered the store to use the ATM while the Defendant and the man remained in the car. When the victim returned, the man directed her to an area nearby where they waited for approximately five minutes until a man in a white truck arrived. The man who was with the victim and the Defendant exited the victim's car, got into the white truck, purchased a pill, returned to the victim's car, and gave the pill to the victim.

- 5 -

The Defendant stated that while the victim was driving away, she said she should have purchased two pills and that the man called the dealer again. They returned to Tolliver's Market where the victim used the ATM, and they met the dealer at a location near a former dump. The man who was with the victim and the Defendant exited the victim's car, entered the white truck on the passenger side, returned to the victim's car, and gave the victim one-half of a pill. The victim drove to the parking lot of a church, and the man asked the victim how much of the pill that she was going to give him. The victim showed the man where to cut the pill, and the man did so. The victim gave the man a portion of the pill, and the victim wrapped the remaining amount of the pills in a clear cigarette wrapper. After the victim drove the man back to his apartment, she and the Defendant returned to the camper. At trial, the parties stipulated to the truthfulness of this statement from the Defendant "regarding the manner in which narcotics were obtained on February 1, 2014, from people in the parking lot at Tolliver's Market."

Detective Muncey testified that a brand name for Oxymorphone is Opana and that Oxymorphone is a Schedule II drug. On cross-examination, Detective Muncey testified that he did not know what a "100 unit needle" was. He did not recall the Defendant stating that the victim had blood on her arm when he found her unresponsive. Detective Muncey acknowledged that "it could be possible" that the Defendant mentioned it but that it was not included in his written statements. Detective Muncey acknowledged that the Defendant could have provided other information that was not included in his written statements.

Detective Muncey stated that he observed "something fresh" on the victim's hand "like a blood vessel or something like that sort of swelling a little bit." He said that while the place on the victim's hand appeared to be a needle mark, "to say that's a needle mark, I couldn't tell you." He agreed that his observations could be consistent with the Defendant's statement that the victim attempted to inject the needle into her hand. Detective Muncey did not recall seeing any other needle marks on the victim.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox and Anderson County, testified regarding her autopsy of the victim. She noted that the victim's sleeves were pulled up above her elbows and observed both fresh and older needle punctures on the victim's right extremity. Dr. Mileusnic-Polchan sent a sample of the victim's blood to a laboratory for analysis. She had suspected that the victim's cause of death was related to drug use based upon the victim's overall appearance and the information obtained by the officers at the scene. There was no external evidence of trauma on the victim's body other than the needle punctures.

According to the toxicology report, the victim had 15.4 nanograms per milliliter of Benzodiaxepines, which is alprazolam or Xanax, in her blood. This level fell within the

therapeutic range. Dr. Mileusnic-Polchan stated that the level was "not concerning" but that the presence of the drug indicated "potential for abuse of other drugs and medications." The victim's blood also had 3.5 nanograms per milliliter of Hydromorphone, which fell within a very low therapeutic range. Dr. Mileusnic-Polchan said that the drug could be a "breakdown product" of Morphine or a separate medication sold under the registered name of Dilaudid. She also said the amount of the drug was at such a low therapeutic range that it was not a contributing factor in the victim's death.

The victim's blood had 154 nanograms per milliliter of Oxymorphone, which is a "breakdown product" of oxycodone, a medication sold as Opana. Dr. Mileusnic-Polchan testified that the drug is an opioid and a Schedule II controlled substance. She noted that the therapeutic range of the drug is five nanograms per milliliter and that twenty nanograms per milliliter is a lethal dose. Thus, the victim had more than thirty times the therapeutic level and more than seven times the lethal dose in her system. Dr. Mileusnic-Polchan stated that this level in the victim's system was extremely rare, that it would be "very hard" to see such a level in someone who had orally ingested Opana in circumstances other than suicide or those involving foul play. She did not find evidence, such as "granular pill like material," in the victim's gastrointestinal system, indicating that the victim orally ingested the drug. Rather, the victim had fresh needle punctures, indicating that the drug was administered intravenously.

Dr. Mileusnic-Polchan testified that any drugs or medication in the form of a pill or a capsule should not be injected. She explained that a pill or capsule is designed to release slowly into the gastrointestinal system so that the person receives a small amount of the drug over a long period of time. However, if injected, the person receives a high level of the medication quickly, which can be deadly.

Dr. Mileusnic-Polchan stated that the victim would not have died had only the Alprazolam and Hydromorphone been in her system. She also stated that the level of Oxymorphone caused the victim's death and would have resulted in her death even if the two other drugs were not in her system.

On cross-examination, Dr. Mileusnic-Polchan testified that the combination of different drugs can have a synergistic effect and an additive or potentiating effect. She stated that the additive effect was the reason she included the use of Alprazolam to the victim's cause of death in the autopsy report. She explained that the combination of Alprazolam and an opiate, both of which have depressing effects, can increase each drug's effect on the central nervous system. However, she stated that due to the high level of Oxymorphone in the victim's system, Alprazolam was not a significant factor in the victim's cause of death and that the level of Oxymorphone was "absolutely more than sufficient to kill, not just one, but several people." Dr. Mileusnic-Polchan testified that

while the cause of the victim's death was listed in the autopsy report as Oxymorphone and Alprazolam intoxication, the report was not prepared for the purpose of evidence at trial but was prepared for the purpose of completing the death certificate and gathering vital statistics. She explained that it was important for the community to know that Alprazolam was being abused just like Oxymorphone. She reiterated that Oxymorphone was the primary cause of the victim's death.

Dr. Mileusnic-Polchan did not believe the victim lived for any extent of time after the Oxymorphone reached the level of 154 nanograms per milliliter. She said it was difficult to determine the number of pills that were required to be injected to reach such a level. She stated that injecting the drugs into an artery would result in a higher concentration of the drug being released in the system at a faster rate. Without knowing whether the drug was injected into the victim's vein or her artery, Dr. Mileusnic-Polchan was unable to determine the number of pills required to reach the level of Oxymorphone that was present in the victim's blood. She explained that factors necessary for such a determination include the concentration of the drug, how the pill was crushed, how the substance that was injected was prepared, and how fast it was injected. She stated that while the level of the drug in the victim's system seemed high if only one pill was injected, there were so many other unknown variables that she was "not willing to guess."

Dr. Mileusnic-Polchan did not recall the number of needle punctures on the victim and noted that many of the marks were superimposed on each other. She observed more than one fresh needle puncture but could not determine the number of fresh needle punctures since they were in the same area. She noted that the older needle punctures were in different stages of healing, and she could not determine the age of these needle punctures.

Mr. Kevin Shanks, a forensic toxicologist for AIT Laboratories ("AIT") in Indianapolis, Indiana, was accepted by the trial court as an expert in the field of toxicology. AIT analyzed the victim's blood sample, and Mr. Shanks offered testimony similar to that of Dr. Mileusnic-Polchan regarding the quantity of substances in the victim's blood. On cross-examination, he testified that one pill of Opana would not produce a level of 154 nanograms per milliliter.

The Defendant testified in his own defense at trial that his daughter introduced him to the victim in November of 2013. The victim had "Roxy's" and Xanax, and they went to the Defendant's camper where they each "snorted" a "Roxy" and the victim also took "a couple" of Xanax pills. The Defendant stated that as they were talking, the victim slumped over, that he shook her and asked if she was okay, and that the victim mumbled, "[Y]eah." The Defendant said the victim remained slumped over for three or

four hours and was in and out of consciousness. After a few hours, the victim awakened and began walking and talking again.

The Defendant testified that he next saw the victim on the day of her death when she drove up to his camper. He had been cleaning a trailer that he owned and was at his camper when the victim arrived. He went outside to speak to the victim, could not remember her name, and referred to her as "Connie." The victim corrected him and asked if she could park in his driveway in order to sleep in her vehicle, and the Defendant said she could sleep in his camper. The victim asked him about obtaining drugs, and he told her that he would need to call someone. The person whom the Defendant called did not have any drugs. The victim said she knew someone who could obtain drugs, but she did not have the person's telephone number. She asked the Defendant if he wanted to ride with her to the apartment complex where the person lived, and the Defendant agreed. The Defendant's testimony regarding the victim's purchasing of one and one-half pills was consistent with his third statement to the police.

The Defendant stated that once he and the victim returned to his camper, he cut a can in which to "cook" the pill. The pill was "a rubber Opana," and the victim cut the pill up using scissors. The Defendant said that each pill was supposed to be forty milligrams of Opana and that one and one-eighth of a pill was put into the can. They each put water in their syringes and squirted the water into the can. The Defendant heated the can, and they both drew the drug into their syringes. He said some of the mixture remained in the can, but he was unsure of the amount. He then shot the drugs into his arm, and he felt the effect of the drugs even before he was able to pull the needle out of his arm.

The Defendant testified that the victim attempted to shoot the drugs into her arm but that it was too dark inside the camper to allow her to do so. He told the victim to move next to the door leading outside the camper where there was more light. The victim moved to the couch, tried to shoot the drugs into her hand, and missed. The Defendant stated that the victim unsuccessfully attempted to inject herself with the drugs multiple times and began cursing. He asked the victim if she wanted him to inject her with the drugs, and she told him that she did. He stated that he sat on the couch, put the victim's arm on his leg, and injected her with the entire amount of the drugs in her syringe. After they spoke for some time, the victim laid her head down. The Defendant asked if he could have "another shot" of the drugs that remained in the can, and she refused. The Defendant then went outside to work in the yard.

The Defendant testified that the door to the camper remained open while he was working outside. He said that at one point, he walked past the camper and did not see the victim sitting on the couch. The Defendant then ate dinner at his daughter's home, which

was located next to the camper. He returned to the camper to see if the victim wanted anything to eat. He stated that the door was open, and he could see the victim on the couch as he was approaching the camper. He found the victim unresponsive. He said he saw blood on the victim's right arm where "everybody usually shoots" and wiped it off. He explained that he was scared because he had failed a drug test five days earlier. He noted that his criminal record included multiple convictions for driving under the influence of an intoxicate and being a habitual motor vehicle offender. He stated that he did not know what happened to the drugs that remained in the can.

The Defendant testified that his cell phone was inoperable, so he went to his daughter's home and used her cell phone to call 911. He stated that he threw the needles into a small fire that was burning in his yard. He maintained that he told the officers about wiping blood off of the victim's arm when giving his second statement but that the information was not included in the statement. He acknowledged that he was not honest in his second statement about where the victim purchased the pill and said he was afraid he would be in danger if he provided this information.

On cross-examination, the Defendant admitted that he was guilty of tampering with evidence. He said that he threw two needles and two syringes into the small fire and that the syringes melted. He agreed that it was his intent to deceive the officers from the outset and that he did not want the officers to know that he was involved in "shooting dope." He stated that he had been released on parole after completing three years of a six-year sentence. At the time of the victim's death, the Defendant had been on parole for four and one-half months and already had failed a drug test. In addition to the convictions for driving under the influence of an intoxicant and being a habitual motor vehicle offender, the Defendant had prior convictions for robbery and attempting to bribe a police officer.

The Defendant agreed that injecting Opana was dangerous. He said he used a 100-unit syringe and injected the victim with 65 units, which was "a common dose." He denied injecting the drugs into the victim's artery rather than a vein, stating "I've shot enough to know."

On redirect examination, the Defendant testified that the dose of the drugs that he administered to the victim did not kill her. He stated that when he walked outside of the camper, the victim was bent over with her head down. While he was walking to his daughter's home, he looked toward the camper and did not see the victim. Upon returning to the camper, the Defendant saw the victim back on the couch and "slumped over" in the same position in which she had been previously.

- 10 -

Ms. Kelly Boles, the Defendant's daughter, testified that she arrived home on the day of the victim's death at around 4:30 or 5:00 p.m. She saw the Defendant in the front yard of a mobile home, which he rented out, and vehicle that she did not recognize in the yard. Approximately thirty minutes to one hour later, the Defendant came to her home and ate dinner. Shortly after the Defendant left, he returned in a "panic" and said he believed the victim had died. The Defendant used Ms. Boles's cell phone to call 911.

The record reflects that on the last day of the trial, the jury began deliberating at 4:08 p.m. and reached a verdict at 4:30 p.m. The jury convicted the Defendant of second degree murder and tampering with evidence. Following a sentencing hearing, the trial court sentenced the Defendant to consecutive sentences of twenty-five years for second degree murder and twelve years as a persistent offender at forty-five percent for tampering with the evidence.

The judgments were entered on September 1, 2015. The Defendant filed an untimely motion for new trial on April 25, 2016, and an amended motion on June 28, 2018. The State filed a response to the Defendant's motion on July 20, 2018. Following a hearing on November 26, 2018, the trial court entered an order denying the motion for new trial on January 3, 2019. The Defendant filed an untimely notice of appeal on January 9, 2019.

## ANALYSIS

Although not raised by the State, we note that the Defendant failed to timely file a motion for new trial. "A motion for new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). This thirty-day time limit for filing a motion for new trial is jurisdictional, and an untimely motion for new trial "is a nullity." *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). "A trial judge does not have jurisdiction to hear and determine the merits of a motion for new trial which has not been timely filed." *State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004). The failure to file a timely motion for new trial deprives a defendant of the opportunity to argue on appeal any issues that should have been raised in the motion for new trial. *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997). Our supreme court has recognized that the failure to timely file a motion for new trial waives plenary review of all issues "except for sufficiency of [the] evidence and sentencing." *Bough*, 152 S.W.3d at 460. Moreover, this court has held that "the failure to file a motion for a new trial, the late filing of a motion for a new trial, and the failure to include an issue in a motion for a new trial results in waiver of all issues, which, if found to be meritorious, would result in the granting of a new trial." *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) (footnote omitted).

A notice of appeal must be filed "within 30 days after the date of entry of the judgment appealed from." Tenn. R. App. P. 4(a). The untimely filing of a motion for new trial does not toll the time for filing a notice of appeal; therefore, an untimely motion for new trial also will result in an untimely notice of appeal. *See State v. Davis*, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). This court may, in the interest of justice, waive the requirement for a timely filing of a notice of appeal. *See* Tenn. R. App. 4(a). However, this court does not have the authority to waive the untimely filing of a motion for new trial. *State v. Stephens*, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007), *abrogated on other grounds as recognized by State v. Randall T. Beaty*, No. M2014-00130-CCA-R3-CD, 2016 WL 3752968, at *20 (Tenn. Crim. App. July 8, 2016)).

The judgments were entered on September 1, 2015. The Defendant did not file his motion for new trial until April 25, 2016, more than six months after the time for filing had passed. Because the Defendant's motion for new trial was untimely, his notice of appeal also was untimely. We conclude that the Defendant's untimely filing of his notice of appeal should be waived in the interest of justice. Nevertheless, as a result of the Defendant's failure to timely file a motion for new trial, he has waived his claim that he is entitled to a new trial due based upon the period of time during which the jury deliberated before reaching a verdict. We decline to exercise our discretion to conduct a plain error review of the issue. Rather, we will review the Defendant's challenge to the sufficiency of the evidence with regard to his conviction for second degree murder, which was not waived by his untimely filing of a motion for new trial.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated

on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As applicable to the present case, second degree murder is "[a] killing of another that results from the unlawful distribution of any Schedule I or Schedule II drug, when the drug is the proximate cause of the death of the user." T.C.A. § 39-13-210(a)(2). The requisite mens reas for second degree murder under this provision is that "the killing be done recklessly as a result of unlawful distribution of a Schedule I or Schedule II drug." T.C.A. § 39-13-210, Sentencing Comm'n Cmt. Oxymorphone is a Schedule II controlled substance. T.C.A. § 39-17-408(b)(1)(N).

The Defendant does not challenge the evidence establishing that he distributed a Schedule II to the victim. Rather, he maintains that the evidence is insufficient to establish that his injecting the victim with the drug was the proximate cause of her death. He does not contest the evidence that the victim died from an overdose of Oxymorphone but maintains that the victim administered the fatal injection to herself after he had injected her with the drug and that the amount of drugs with which he injected the victim was insufficient to result in the level of the drug detected in the victim's blood following her death.

"'Proximate cause is that which, in a natural and continual sequence, unbroken by any new, independent cause produces the injury, and without which the injury would not have occurred.'" *State v. Pack*, 421 S.W.3d 629, 639 (Tenn. Crim. App. 2013) (quoting *Gray v. Brown*, 217 S.W.2d 769, 771 (Tenn. 1948)). The victim's death must be the natural and probable result of the defendant's unlawful conduct. *State v. Goodwin*, 143 S.W.3d 771, 779 (Tenn. 2004). However, the defendant's actions "need not be the sole or immediate cause of the victim's death." *State v. Farner*, 66 S.W.3d 188, 203 (Tenn. 2001) (citing *Letner v. State*, 299 S.W. 1049, 1051 (Tenn. 1927)). Rather, "a wrongdoer cannot escape liability for a criminal act just because the criminal act of another contributed to produce the prohibited consequence." *State v. Baggett*, 836 S.W.2d 593, 595 (Tenn. Crim. App. 1992). Therefore, "one whose wrongdoing is a concurrent proximate cause of an injury may be criminally liable the same as if his wrongdoing [was] the sole proximate cause of the injury." *Id.* The defendant "'is responsible if the direct cause results naturally from his conduct. *The same is true if the direct cause is an act of the deceased himself reasonably due to defendant's unlawful conduct.*'" *Farner*, 66 S.W.3d at 203 (quoting *Letner*, 299 S.W. at 1051) (emphasis in *Farner*). "'[T]he act of the deceased, resulting in his death (not being corporally injured by the defendant), must have been the natural and probable consequence of the unlawful conduct of [the defendant].'" *Id.* (quoting *Fine v. State*, 246 S.W.2d 70, 73 (Tenn. 1952)).

A victim's contributory negligence is not a complete defense but may be considered in determining whether the defendant's conduct was a proximate cause of the victim's death or whether the victim's actions were "'an independent, intervening cause of death.'" *Id.* at 203-04 (quoting *Fine*, 246 S.W.2d at 73). "When a defendant seeks to break the chain of causation based on a supervening cause, the victim's death must be so 'unexpected, unforeseeable or remote' that the defendant's actions could not legally be the cause of death." *Joseph Pollard v. State*, No. W2013-01398-CCA-R3-PC, 2014 WL 4243767, at *7 (Tenn. Crim. App. Aug. 27, 2014) (quoting *State v. Randolph*, 676 S.W.2d 943, 948 (Tenn. 1984)). The determination of causation in a criminal case is a question of fact to be determined by the trier of fact based on the evidence at trial. *Farner*, 66 S.W.3d at 204; *Randolph*, 676 S.W.2d at 948.

We need not determine whether the Defendant's claim that the victim injected herself with the remaining amount of the drug after the Defendant injected her constituted an independent, intervening cause of the victim's death because the evidence, when viewed in a light most favorable to the State, does not support the Defendant's claim of a subsequent injection. The Defendant speculates that the victim must have injected herself with the remaining drugs because, at one point, he looked toward the camper while outside and did not see the victim on the couch and because the victim had blood on her arm. However, the jury was free to reject such a claim especially given the fact that the Defendant acknowledged at trial that he did not know what happened to the drugs that remained in the can.

The evidence, when viewed in a light most favorable to the State, establishes that the victim was not incapacitated due to drug use prior to the Defendant's injecting her with a drug, in that she was able to drive and hold a conversation; that the Defendant injected the victim with Oxymorphone, after which the victim immediately slumped over on a couch; that the victim died shortly thereafter; and that the victim had more than seven times the amount of a lethal dose of the drug in her system. The Defendant maintains that the drug mixture only contained one and one-eighth of a pill and that his injecting the victim with only a portion of the mixture would not have accounted for the high concentration of the drug in the victim's system. However, the jury was free to reject the Defendant's testimony regarding the amount of the drug purchased and injected. Moreover, Dr. Mileusnic-Polchan testified that the number of pills necessary to reach the level in the victim's system depended upon a number of factors, and she was unable to opine that the injection of one pill was insufficient to reach such a level. We, therefore, conclude that the evidence presented at trial supported the jury's finding that the Defendant's injecting the victim with the drug was a proximate cause of her death. The Defendant is not entitled to relief.

- 14 -

**CONCLUSION**

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE